# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA: CIVIL DIVISION

## GERALD D. DA'VAGE
### 7110 Foster Street
### District Heights, Md.
### 20747-2310
### Email: nabi.dgd@gmail.com
### Plaintiff.



### VS.

Case: 1:21–cv–01318 JURY DEMAND
Assigned To : Moss, Randolph D.
Assign. Date : 5/10/2021
Description: Pro Se Gen. Civ. (F–DECK)

## DISTRICT OF COLUMBIA
## HOUSING AUTHORITY
### 1133 North Capitol Street, NE
### Washington, DC   20002
### Defendant.

**Serve: RONALD  MCCOY,
PAULETTE  CAMPBELL,
RONNIE  THAXTON,
MIRANDI  GILLIS.**



## CIVIL ACTION NO.:_____
## 42 USC SECTION 1983 COMPLAINT
## WITH SUPPORTING AFFIDAVIT

RECEIVED
CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC
2021 MAY 10

RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT

CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC
2021 MAY 10  A 11: 32

VOID

RECEIVED

FILING DEPOSITORY

RECEIVED
Mail Room

RECEIVED
Mail Room
VOID
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# **TABLE OF CONTENTS**

- CASES CITED: . . . . . . . . . . . . . . . . . . . ii, iii

- INTRODUCTION: . . . . . . . . . . . . . . . . . iv

- JURISDICTION AND VENUE: . . . . . . . . . . 1

- STATUTE OF LIMITATIONS: . . . . . . . . . . . 2

- SUMMARY OF COMPLAINT: . . . . . . . . . . . 2 – 7

- PARTIES: . . . . . . . . . . . . . . . . . . . 7 – 13

- DUE PROCESS VIOLATIONS DURING
  ALLEGED MISCONDUCT INVESTIGATION: . . . . . . . . 14, 15

- RESIGNATION: . . . . . . . . . . . . . . . . . 16

- WAS EMPLOYEE FREE TO CHOOSE: . . . . . . . . . . 16, 17

- UNDERSTANDING NATURE OF TRANSACTION: . . . . . . 18 – 22

- WAS EMPLOYEE GIVEN REASONABLE TIME TO CHOOSE: . . 22, 23

- EMPLOYEE WAS NOT PERMITTED TO SELECT
  EFFECTIVE DATE OF RESIGNATION: . . . . . . . . . . 24

- WITHHOLDING AND MISREPRESENTATION
  OF MATERIAL INFORMATION: . . . . . . . . . . 24 – 26

- WAS EMPLOYEE OFFERED
  ALTERNATIVE TO RESIGNATION: . . . . . . . . . . 26, 27

- DID EMPLOYEE HAVE ADVISE OF COUNSEL: . . . . . . 27

- DEMAND FOR JURY TRIAL: . . . . . . . . . . . 27

- PRAYER FOR RELIEF: . . . . . . . . . . . . . 27

- AFFIDAVIT IN SUPPORT: . . . . . . . . . . . 28 – 32

- CERTIFICATE OF SERVICE: . . . . . . . . . . . 33

i

# CASES CITED

<u>Haines v. Kerner</u>, 404 US 520 (1971): . . . . . . . . . . . . . . 1

<u>Banks v. Chesapeake and Potomac Telephone Co.</u>, 802 F.2d 1416, 1417
(DC Cir.1986): . . . . . . . . . . . . . . . . . . . . 2

<u>Daskalea v. District of Columbia</u>, 227 F.3d 433, 446 (DC Cir.2000). . . . . . . 2

<u>Brown v. United States</u>, 742 F.2d 1498, 1509 (DC Cir.1984) (enbanc). . . . . . 2

<u>Cleveland Bd. Of Education v. Loudermill</u>, 470 US 532, 538 (1985) . . . . . . 14

<u>Service v. Dullas</u>, 354 US 363 (1957) . . . . . . . . . . . . . . 15

<u>DC, MPD v. Stanley</u>, 942 A.2d 1172 (DC Cir.2008) . . . . . . . . . 16

<u>Stone v. Univ. of Md. Med. Syst. Corp.</u>, 855 F.2d 167, 174 (4th Cir.1988) . . . . 16

<u>Hargray v. City of Hallandale</u>, 57 F.3d 1560 (11th Cir.1995) . . . . . . . 16

<u>Paroczay v. Hodge</u>, 279 F.2d 439, 441 (DC Cir.1961) . . . . . . . . 17

<u>Covington v. Dept. Health & Human Services</u>, 750 F.2d 937, 943 (Fed. Cir.1989). 19

<u>Schbinsky v. United States</u>, 488 F.2d 1003, 1006 (1973) . . . . . . . . . 19

<u>Miller v. DC, Fire and EmergencyMed. Servs., Dept</u>, OEA Matter
No.: J-0103-07 . . . . . . . . . . . . . . . . . . 19

<u>Scharf v. Dept Of The Air Force</u>, 710 F.2d 1572, 1574 (Fed. Cir.1983) . . . . 20

<u>Terban v. Dept of Energy</u>, 216 F.3d 1021, 1024 (2000) . . . . . . . . 21

<u>Jackson v. United States</u>, 573 F.2d 1189, 1197-99 (1978) . . . . . . . 22

<u>Williams v. Walker – Thomas Furniture, Co.</u>, 350 F.2d 445 (1965) . . . . . 22

<u>Manzi v. United States</u>, 198 Ct Cl 489, 494 (1972) . . . . . . . . . 22

<u>Cuff v. DC, Dept of GSA</u>, OEA Matter No.:1606-0009-12R17 (2016) . . . . . 22

**Jefferson v. Harris,** 170 F.Supp.3d 194 (D.D.C. 2016) . . . . . . . . . 23

**Arizona Dept of Economic Security v. Redlon,** 156 P.3d 430 (2017) . . . . . 23

**Schultz v. United States,** 810 F.2d 1133, 1136 (1983) . . . . . . . . 24

**Turninski v. Wilkes-Barre,** CA No.:04-CV-1919, 2006WL 3742714,
.                  *7  (M.D. Pa. Dec. 18, 2006) . . . . . . . . 24

**Baur v. Holder,** 25 F.Supp.3d 842, 853 (D.D.C. 2014) . . . . . . . . 26

**Argarita v. St. Louis County,** 981 F.2d 1537, 1545 (1992) . . . . . . . 27

**Garrity V. New Jersey,** 382 US 493 (1967) . . . . . . . . . . 27

# 42 USC SECTION 1983

Section 1983 allows a claim for monetary damages against a state actor by persons who are deprived of "any rights" that are "secured by the . . . laws."   The statute provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  **42 USC Sec. 1983.**

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA: CIVIL DIVISION

GERALD D. DA'VAGE
7110 Foster Street
District Heights, Md.
          20747-2310
Email: nabi.dgd@gmail.com
         Plaintiff
        VS.               CIVIL CASE NO.: _____
DISTRICT OF COLUMBIA      42 USC SECTION 1983 COMPLAINT
HOUSING AUTHORITY        AND DEMAND FOR JURY TRIAL
1133 North Capitol Street, NE
Washington, DC      20002

Serve: RONALD MCCOY, PAULETTE
CAMPBELL, RONNIE THAXTON,
MIRANDI GILLIS,
          Defendants.

## MEMORANDUM OPINION SUPPORTED BY AFFIDAVIT AND POINTS OF LAW

**NOW COMES,** Plaintiff, (Gerald D. Da'Vage) asking this Court for Judgement in

his favor against the District of Columbia Housing Authority (hereinafter "Agency") and

Defendants, jointly and severally, and in support thereof state:

## INTRODUCTION

1)     Agency is a federally-funded independent housing authority established by the

District of Columbia government for District of Columbia residents.   In its operation,

Agency is partially governed by federal laws, rules and regulations implemented

by the United States Department of Housing and Urban Development (HUD).

2)     Agency's procedural Due Process violations under the U.S. Constitution,

iv

while applying, Title 14 District of Columbia Municipal Regulations – DCHA Personnel Policy and Procedural Manual, SECTION 7111 & 7141: TERMINATION OR REMOVAL OF EMPLOYMENT, and Title 5 Code of Federal Regulations (CFR) SECTION 752 Subchapter D – ADVERSE ACTIONS; during investigation of alleged misconduct and Employee Personnel Action, resulted in adverse personnel actions being carried out in substantial violation of procedural and policy regulations, therefore, Agency actions and inactions are void and Plaintiff is entitled to recover all parts of which he has been illegally deprived.

3)      Plaintiff at all relevant times was a permanent Agency employee, hired April 21st, 2008, as a Construction Inspector, and could only be removed for cause with due process.      This Complaint highlights Agency's gravely unfair investigation proceedings which subsequently contributed to Agency's application of duress, coercion, time pressure, withholding and misrepresentation of material information and other Agency improper actions and inactions during Employee's Personnel Action that resulted in Plaintiffs Thursday, December 21st, 2017, involuntary resignation.

## LAYMAN'S STATEMENT

4)      Pro Se pleadings are to be held to less stringent standards, than those drafted by practicing attorneys.   **Haines v. Kerner, 404 US 520 (1971).**

## JURISDICTION AND VENUE

5)      This Court has jurisdiction per **28 USC Section 1331** (federal question) and **28 USC Section 1343** (civil rights question).   Venue is proper under **28 USC Section 1391(b)(2)** where acts and omissions of Complaint occurred in this Judicial district.

1

## STATUTE OF LIMITATIONS: PERSONAL INJURY

6)      Three-year statute of limitations applicable to personal injury suits controls

actions brought under **Title 42 USC Section 1983,** in the District of Columbia. See,

**Banks v. Chesapeake and Potomac Telephone Co.,** 802 F.2d 1416, 1417

**(DC Cir.1986);** See also, **DC Code 12 Section – 301(8).**

7)      "**DC Code 12 Section – 309,** six-month notice does not apply to Plaintiffs

claim under Section 1983", **Daskalea v. District Of Columbia,** 227 F.3d 433, 446 (DC

**Cir.2000); Brown v. United States,** 742 F.2d 1498, 1509 (DC Cir.1984) (en banc).

## SUMMARY OF COMPLAINT

8)      Thursday, December 14th, 2017, 9am, Milton Dyer questioned Plaintiff

about unauthorized gas card usage.      Plaintiff denied all allegations.   Milton Dyer

forwarded allegations to Human Resources (HR) for investigation and with

Ronald McCoy's approval, recommended Plaintiffs immediate termination.

9)      Plaintiff got gas card receipts from glove compartment of assigned

vehicle, and instructed union representative Richard Allison, to introduce

receipts as mitigating evidence during investigation to show that similar purchase activity

or routine practice (**Fed.R.Civ.P. 406** – Routine Practice) from similarly situated

individuals assigned to vehicle and gas card receive similar discipline.   Richard

Allison stated, "let's wait to see what HR says".

10)     Tuesday, December 19th, 2017, 8am, Milton Dyer informs Plaintiff, "not to

leave Agency, HR wants to talk to you this morning regarding gas card allegations".

2

11)     Minutes later, Richard Allison called Plaintiff informing him that union shop steward, Lisa Kelly would be accompanying him to HR investigation.    Richard Allison "did not advise Plaintiff of his right to retain private counsel" for representation.

12)     Prior to attending HR investigation with Lisa Kelly, Plaintiff informed Lisa Kelly about gas card receipts found in glove compartment and instructed her to introduce receipts as mitigating evidence.    Plaintiff also informed Lisa Kelly that Housing Choice Voucher Program (HCVP) Director, Ronald McCoy was previously assigned vehicle and gas card, before vehicle and gas card was assigned to Plaintiff, therefore, receipts found in glove compartment with similar purchase activity were the results of Director Ronald McCoy's gas purchases.    See, **FOOTNOTE #1.**

13)    Lisa Kelly stated, "this is about you, Ronnie says they have video and photos of you making unauthorized gas card purchases; this is not about other employee's, especially not Mr. McCoy".   Ronnie Thaxton told Lisa Kelly, Agency had video and photos of Plaintiff making unauthorized gas card purchases to coerce his resignation.

14)    Lisa Kelly accompanied Plaintiff to Tuesday's, December 19th, 2017, 10am, HR investigation, and did not inform Plaintiff 'pre-nor-post investigation, that he had the right to retain private counsel for representation during HR investigation'.

---

**FOOTNOTE #1:**    Plaintiff listed routine practice of gas card purchases from similarly situated employees, 'with gas receipts as exhibits', as a line of defense during February, 2018, Office of Employee's Appeal (OEA) appeal.    Agency stated in OEA response, "[Plaintiff] seemingly argues that [Agency] should not discipline him because others had committed the same offense".   See Agency's March 16th, 2018, Motion for Summary Disposition, pg.5, para.1.    OEA did not reach the merits of Plaintiffs appeal because Agency was exempt from OEA review because it was not an agency of the District of Columbia government.

Plaintiffs OEA argument was, "similar punishment for similar gas card usage".

15)    Tuesday, December 19th, 10am, Ronnie Thaxton conducted HR investigation and 'did not advise Plaintiff of his right to retain private counsel'.    Ronnie Thaxton 'presented no physical evidence i.e., no pictures or video of gas purchases', and Plaintiff denied all allegations about unauthorized gas card purchases.    Investigation ended at approximately 11am, (See, EXHIBIT A), with Ronnie Thaxton stating, "I have all of the information that I need, I will contact you when I have reached my decision".

16)    Plaintiff exited HR, returned to inspections department; Lisa Kelly remained in HR.    Ronnie Thaxton entered inspections department at approximately 11:10am, entered Milton Dyer's office carrying the very same folder used to take notes, and that questions where read from during Plaintiffs HR investigation and held a five – to – ten - minute, closed door meeting with Plaintiffs immediate manager, initiator of HR investigation and recommender of Plaintiff's immediate termination. See, **FOOTNOTE #2:**

17)    It is very well established that where a deciding officials exparte communications with Plaintiff's immediate manager were contemplated in deciding underlying charge or penalty, actions cannot stand, because procedural due process guarantee's Plaintiff the opportunity to respond pre-HR decision where Milton Dyer is initiator of investigation and recommender of Plaintiffs immediate termination.

**FOOTNOTE #2:** Plaintiff raised exparte communications between Ronnie Thaxton and Milton Dyer inviolate of due process rights during HR investigation in OEA appeal as a line of defense.    In response, Agency acknowledged closed door meeting did take place, but stated that Plaintiff had no knowledge of what was discussed. OEA never reached the merits of Plaintiffs, February, 2018, OEA appeal because Agency was exempt from review because it was not an agency of the District of Columbia government.

18)    Post investigation, Plaintiff received nothing in writing, had no direct contact

~~or direct communications with Ronnie Thaxton or Lisa Kelly explaining post HR~~

investigation procedures; Plaintiff never responded to exparte communications.

19)    Tuesday, December 19th, 2pm, Mirandi Gillis called Plaintiff stating:
"I just talked to Ronnie, on Friday, [December 22nd] they are going
to serve termination papers on you, unless you resign before
that.   If you do not resign before Friday, you will be immediately
suspended for 30-days, unpaid administrative leave pending a
criminal investigation.    If they find you guilty, they will seek
criminal prosecution and try to send you to jail - - - it will affect
your pension/retirement benefits, health/life insurance benefits,
and you will not be able to receive any unemployment or
another government job, if you do not resign by Friday.  - - -
however, they are also saying that if you resign immediately,
before Friday, they will give you 30-days paid administrative
leave and a clear HR file, that way you can get another government
job".

20)    Plaintiff's 2pm, call continued with Plaintiff asking, "do I call my supervisor

and let him know that I will not be reporting to work" ?    Mirandi Gillis stated, "<u>No, they</u>

<u>know that you will not be returning to work</u>, (See, **FOOTNOTE #3:**), I'll schedule a

meeting with Ronnie tomorrow morning [Wednesday, December 20th], 10am, at HR and

Payroll office to officially address the questions that you have raised; you need to meet

me there." (See, EXHIBIT A).

21)    After 2pm, telephone call with Mirandi Gillis, Plaintiff completed his

remaining housing inspections, returned to Agency headquarters, uploaded his daily

reports then attempted to ascertain information from HR and Payroll Office about the

**FOOTNOTE #3:** Mirandi Gillis remark, "No, they know that you will not be returning
to work" was relied on by Plaintiff, until Thursdays, 11am, December 21st, call stating
that Plaintiff would be charged leave for days missed from work.  Agency's deceptive
confusion prevented Plaintiff from knowing exactly how his protected interest was being
taken, or how to establish a line of defense because he received nothing in writing from
Agency.

financial consequences of rapidly approaching decision and its negative affect's

on benefit options but HR and Payroll Office had closed for the day.

22)     Wednesday, December 20th, 10am, the very next morning, Plaintiff again

attempted to ascertain material information from HR and Payroll office, but Agency

was closed for its 'Christmas Party'.

23)     Thursday, December 21st, 11am, Mirandi Gillis called Plaintiff stating, "If you

do not go to the office today and turn in your resignation letter, HR will start to charge

you your earned leave and may even withdraw resignation offer and initiate a criminal

investigation".    (See, EXHIBIT A).

24)     Mirandi Gillis informed Plaintiff that she would call Ronnie to see what other

options were available.     Mirandi Gillis returned to the telephone call stating, "Ronnie

informed me that OGC (Office of General Counsel) was firm in its decision to issue

termination by Friday and that he was only waiting on the Director's signature, but

everyone else had signed off and he would have the remaining signature Friday

morning.    The only other option [Plaintiff] has is to resign his position, other than

that they were moving forward with Friday's [December 22nd] termination".  See,

**FOOTNOTE #4** and (EXHIBIT A).

25)     Plaintiffs Thursday, December 21st, 11am, telephone call continued with

Plaintiff stating, "[He did] not know how to write a resignation letter" and Mirandi Gillis

stated, "union representative Richard Allison, will write your resignation letter, all you

---

**FOOTNOTE #4:**   Agency responded to Plaintiffs, March 19th, 2018, OEA appeal
stating, "At the time of [Plaintiffs] resignation, DCHA had not finalized its investigation
or approved discipline".    Plaintiff relied on Ronnie Thaxton's 11am, false statement i.e.,
"OGC was firm on issuing Friday termination" and resigned three hours later, 2pm,
Thursday, December 21st.

have to do is sign it and take it upstairs to HR; Richard is waiting on you".    Mirandi

Gillis did not inform Plaintiff that resignation selection would preclude administrative

appeal.

26)    Once Plaintiff informed Mirandi Gillis of his intent to resign during Thursdays

11am, telephone conversation and Mirandi Gillis informed Ronnie Thaxton,

(See, Exhibit A) that Plaintiff had intentions on resigning, Plaintiffs alleged misconduct

investigation ended and Employee's Personnel Action i.e., resignation began mandating

due process protection from Agency.

27)    Thursday, December 21st, 2pm, Plaintiff arrived at Agency's union office,

received resignation letter from Richard Allison, signed letter, then took letter

upstairs to HR.    Richard Allison did not inform Plaintiff that resignation selection would

preclude the filing of an administrative appeal.

28)    HR received Plaintiffs resignation letter, there was no Exit Interview Form or

Notification of Personnel Action Form 50 issued.        In remarks section of

Exit Interview/Form 50, Agency was to quote verbatim, Plaintiffs reason for resigning.

HR did not inform Plaintiff that resignation selection would preclude administrative

appeal, or ask Plaintiff his reason for resigning for Agency's remarks section.

## **PARTIES**

29)    Plaintiff, Gerald D. Da'Vage is a resident of Prince George's County in the

State of Maryland.    At all relevant times Plaintiff was permanently employed by

District of Columbia Housing Authority ("Agency") as a construction/HCVP inspector.

30)     Defendant, District of Columbia Housing Authority ("Agency") is a municipal entity which employs or employed the following Defendants at all relevant times and is sued in its official capacity.     Employees of Agency engaged in the actions and inactions complained of herein while executing the policies, practices and customs of Agency in violation of Plaintiffs U.S. Const. Amend. rights.

31)     Defendant, Ronald McCoy, Agency employee for over a decade, at all relevant times was Director of the Housing Choice Voucher Program (HCVP) in his capacity as an Agency employee and is sued in his individual and official capacity.

32)     As such Ronald McCoy was direct supervisor or one level higher than HCVP Inspections Manager, Milton Dyer, who was Plaintiff's immediate manager, initiator of alleged misconduct investigation and recommender of Plaintiff's immediate termination.

33)     Ronald McCoy approved of Plaintiff's termination; should have known or reasonably knew termination was inviolate of Plaintiff's procedural due process rights where Ronald McCoy nor Milton Dyer received, signed or saw anything representative of Plaintiff's advance written notice, opportunity to be heard after receiving advance written notice or pretermination hearing results, specifically where Milton Dyers recommended HR investigation and immediate termination required Ronald McCoy's approval which is the formal link that Ronald McCoy was knowledgeable of termination.

34)     Defendant, Paulette Campbell, Agency employee for over a decade, at all relevant times in her capacity as Agency employee was Director of Human Resources Department (HR) which established, maintained and enforced the procedures that directly caused violations of Plaintiff's Constitutional rights and is sued in her individual and official capacity.

8

35)    As such Paulette Campbell set into motion a series of actions and inactions by

clothing Ronnie Thaxton with governmental authority needed for the constitutional abuse

during alleged misconduct investigation and Employee Personnel Action i.e., resignation.

36)    Once Milton Dyer forwarded allegations to HR, recommending immediate

termination and Paulette Campbell saw investigation was complete, she allowed Ronnie

Thaxton to begin termination procedures by tacitly agreeing to Plaintiff's termination,

thereby establishing her formal link to Plaintiff's constitutional violations.

37)    Per, **DC Code Title 14 Section 7111 & 7141**; Collective Bargaining Agreement

(CBA): Article 10 – Discipline: Section D2d (1) Removal, Paulette Campbell

should have guaranteed that Plaintiff received advance written notice, place to observe

evidence and opportunity to respond to misconduct allegations before allowing the

initiation of the termination procedures to begin.

38)    Paulette Campbell, HR Director, knew or reasonable should have known that

Plaintiff did not receive minimal Due Process protections under our US Const. Amend.,

as opined by the United States Supreme Court, District of Columbia Codes, Agency

policy, regulations and CBA, and did nothing to protect Plaintiffs Constitutional rights.

39)    Paulette Campbell knew or reasonable should have known that once Plaintiff

stated his intent to resign and Ronnie Thaxton became aware of Plaintiffs resignation

intentions that HR inactions and omissions would prevent Plaintiff from making a free

and informed decision regarding resignation, termination or standing and fighting

misconduct allegations with any degree of success.  In other words, Paulette Campbell

knew that Agency's failure to follow pertinent laws, regulations and policies would and

9

did violate Plaintiff's Due Process rights during investigation and resignation procedures.

40)   Paulette Campbell acquiesced to violations with a deliberate indifference to Plaintiff's right to fundamentally fair procedures and failed to correct or prevent obvious violations as they repeatedly occurred.

41)   Post alleged misconduct investigation procedures, Paulette Campbell clearly disregarded the obvious consequences of Agency closures, lack of material information HR made available to Plaintiff in writing, and the unreasonable risk of violating Plaintiffs Due Process rights that omissions and closures caused by allowing Ronnie Thaxton to accept Thursdays, December 21st, involuntary resignation after Agency closures Tuesday evening, and Wednesday for Agency 'Christmas Party'.  Paulette Campbell deliberately disregarded the minimum two-week notice for voluntary resignations and a person with her HR experience would know her actions were prejudicial to Plaintiff.

42)   Defendant Ronnie Thaxton, at all relevant times hereto in his capacity as Agency employee was HR's Labor and Employee's Relations Manager for the past decade and is sued in his individual and official capacity.

43)   Ronnie Thaxton conducted Plaintiff's alleged misconduct investigation and managed Agency's unlawful application of duress, coercion, time pressure, withholding and/or misrepresentation of material information and other improper inactions and actions which produced Plaintiff's involuntary resignation.

44)   Ronnie Thaxton did not advise Plaintiff of his right to retain private counsel for representation during misconduct investigation; mislead Lisa Kelly to believe Agency had video and photos of Plaintiff making unauthorized gas card purchases but never produced video or photos.

10

45)   Ronnie Thaxton did not inform Plaintiff that resignation selection would preclude administrative appeal rights.

46)   Ronnie Thaxton prepared Plaintiff's termination documents and circulated documents for confirmation signatures as though Plaintiff had received: (a) advance written notice, (b) opportunity and place to view evidence, (c) opportunity to respond and (4) pretermination hearing.   Plaintiff, received none of the above mentioned procedural due processes in violation of his US Const. Amend. rights.

47)   Ronnie Thaxton, withheld and/or misrepresented material information when he informed Plaintiff through Mirandi Gillis that, "Office of General Counsel (OGC), was firm on issuance of termination by Friday, December 22nd, and [Plaintiff's] only other option was to resign his position before Friday, December 22nd, other than that, they are moving forward," [with Friday's, December 22nd, termination].   See, **FOOTNOTE #3:** Agency states, "at the time of resignation DCHA had not finalized its investigation or approved discipline."   This is Agency deception used to coerce Plaintiffs resignation.

48)   Ronnie Thaxton stated in a sworn affidavit dated, July, 2018, that, **"8.   I never discussed the possibility of resignation or its potential impact on his employment benefits with [Plaintiff]".**   See, (EXHIBIT B).   Sworn affidavit shows that Agency never informed Plaintiff of the very nature, understanding or financial consequences of the rapidly approaching transaction once Plaintiff stated his intent to resign.

49)   Defendant Mirandi Gillis, for the past decade and at all relevant times hereto was the president of the American Federation of Government Employee's Local #2725, and is sued in her individual and official capacity.

50)    Agency entered into a Collective Bargaining Agreement (CBA) with Local
#2725 to protect the rights and interest of the employee's, the union and the Agency.

51)    District of Columbia government wide laws, rules and regulations not
inconsistent with CBA are nevertheless, applicable to Agency, Plaintiff and the union.

52)    Mirandi Gillis actions and inactions during alleged misconduct investigation
and Employee's Personnel Action i.e., resignation was entwined with the District Of
Columbia government wide policies, laws, rules and regulations or so impregnated with
governmental characteristics that Mirandi Gillis actions and inactions were subject to the
constitutional limitations placed upon state actions and inactions, thereby Mirandi Gillis
acted under color of law during all relevant times conspiring with Agency to violate
Plaintiff's constitutionally protected Due Process rights.

53)    When private groups or individuals are endowed with functions governmental
in nature, they become instrumentalities of governmental functions and subject to
constitutional limitations as they join state actions in furtherance of state objectives.

54)    Mirandi Gillis received and acted upon Ronnie Thaxtons Tuesday, December
19th, 2pm, telephone call by informing Plaintiff that, "he had to resign by Friday,
December 22nd, or be terminated with subsequent criminal investigation and prosecution
if found guilty", and Thursday's, December 21st, 11am, phone call where Plaintiff was
instructed "to resign immediately or be charged his earned leave".

55)    Mirandi Gillis knew or reasonably should have known that Plaintiff had not
received any type of written advance written notice, time to meaningfully review and

respond to Agency allegations, nor pre-termination hearing, because per, CBA Article 10

Section D – Admonitions and Discipline: 2 Discipline – d. Removal (1) ". . .   shall be in

writing . . . and shall be provided to the employee and the employee's representative in

accordance with Section C, 1, e, (8) of this Article" i.e., Article 10.

56)     Mirandi Gillis received and acted upon Ronnie Thaxtons, Thursday, December

21st, 11am, telephone call knowing that Agency was closed all day on Wednesday,

December 20th, for its 'Christmas Party', and Tuesday evening when Plaintiff sought

information on his choices.

57)     Mirandi Gillis knew Plaintiff was at an informational disadvantage, to make a

free and informed decision and with deliberate indifference towards the consequences

Plaintiff would suffer from informational disadvantage during decision making inviolate

of Plaintiffs Due Process rights, Mirandi Gillis allowed Plaintiff to resign without

advising Plaintiff that resignation would preclude administrative appeal rights.

# DUE PROCESS VIOLATIONS
# DURING ALLEGED MISCONDUCT INVESTIGATION

58)    Plaintiff had a property interest in his continued employment, which protected

him from arbitrary dismissal and deprivation of property interest without due process.

**Cleveland Bd. Of Education v. Loudermill**, **470 US 532, 538 (1985)**.

59)    District of Columbia Municipal Regulations, **Title 14 Section 7111** states in

pertinent part: "**7111.4** – Permanent employee's subject to removal <u>shall</u> receive prior

written notice of removal that includes: (a) statement of cause for removal, (b) place

to inspect personnel file, and (c) appeal right.

60)    Agency's CBA states in relevant part: "Article 10 – DISCIPLINE – Section

D – Admonitions and Discipline:  2. Discipline – d. Removal – (1) ". . ., a removal may

not be issued unless it has been reviewed and approved by a management official who is

at least one level higher than that of the issuing official.    The approval shall be included

in the official record and shall be provided to the employee . . ."    (2) The employee

against whom the removal action is initiated shall be served with written notice of the

charges and shall be informed that he or she will be removed after 30 - calander days.

Also, Section C, 1, e, (8), of Article 10 – Principles of Discipline – ". . . action shall

inform the employee of his or her right to appeal."

61)    Per CBA Article 10 DISCIPLINE: Section C – Principles of Discipline:

Administration.   "C.  Disciplinary action(s) must be initiated promptly and may not be

issued more than forty-five (45) days from the date DCHA knew or should have known

of the alleged offense.    Agency's acknowledgment that unauthorized usage occurred

6-months before alleged disciplinary actions were taken, voids alleged Agency action

per CBA Article 10:   C.   Administration of Discipline.

Plaintiff received nothing in writing, allowing Agency to hide the fact that basis of allegations, were time barred per CBA which states, "disciplinary actions --- may not be issued more than 45-days from the date [Agency] knew or should have known of the alleged offense".   HR's investigative meeting revealed that Agency knew of allegations 6-months prior to issuance of disciplinary action.

62)   Mirandi Gillis statement (EXHIBIT A) says that, "It was determined in the investigative meeting that [Plaintiff] was in possession of the card by his own admission and that 'he had been in possession of the card <u>'for approximately 6-months which covered the span of time that the card was experiencing the unauthorized usage</u>'".

63)   Where US Supreme Court precedent, DC Municipal Reg's, Agency's CBA and Personnel Manual has been clearly violated, Agency's actions cannot be binding as a matter of fundamental fairness and Due Process. **Service v. Dullas, 354 US 363 (1957).**

64)   The absence of Due Process left Plaintiff without the informational weaponry for a fundamentally fair HR resignation.   Investigation deprived Plaintiff of material information needed for informed and free decision during subsequent resignation. Information such as date of purchases, locations, time, etc., because this information could have been compared to inspection schedule and gas receipts found in glove compartment of assigned vehicle. What's relevant, is withheld information, would've allowed Plaintiff to set forth prima facia evidence, that arguable basis for termination did not exist where similar employees, made similar gas purchases and were not terminated, which Agency admits to in March 16th, 2018, Motion for Summary Disposition.

# RESIGNATION

65)   In **DC, MPD v. Stanley, 942 A.2d 1172 (DC. Cir.2008)** Court held,

decision to resign is voluntary if, (1) employee is free to choose, (2) understands

nature of transaction, (3) is given reasonable amount of time to make informed

choice, and (4) is permitted to select effective date of resignation.   Other circuits

have indicated additionally that resignation is voluntary, (5) where employee was given

alternatives to resignation, and (6) whether employee had the advice of private counsel.

See, **Stone v. Univ. Of Md. Med. Sys. Corp**, 855 F.2d 167, 174 (4thCir.1988);

**Hargray v. City Of Hallandale, 57 F.3d 1560 (11th Cir.1995).**   Plaintiff clearly meets

the involuntary resignation bench mark set forth in this circuits **Stanley**, opinion.

## WAS PLAINTIFF FREE TO CHOOSE

66)   In **Stone,** Court held, "lack of free choice may be established by

evidence of duress".   Here, duress Plaintiff felt was exacerbated by his inability in the

time permitted, despite significant efforts to attain material information pertinent to

informed decision making.   An inability Agency was "wholly responsible" for.   See,

**Stanley,** ("[Agency] closed when employee sought to ascertain financial information

regarding his choice").   **Id**.

67)   Plaintiff sought financial and benefit option information from Agency

Tuesday, December 19th, after 2pm notification, but Agency had closed for the day.

Wednesday, December 20th, 10am, the very next morning, Plaintiff returned to Agency,

however, Agency was closed for its 'Christmas Party'.

16

68)     **Stanley**, held, "considering time pressure and informational

disability together, we cannot find sufficient evidence to support the   . . .

determinations that . . . retired voluntarily.   **Id**.

69)     The element of voluntariness is vitiated when resignation is submitted under

duress brought on by employer's actions or inactions.   **Stanley.**     Plaintiff's duress

was caused by Agency's closures, withholding and misrepresentation of material

information which caused an informational disability that prevented Plaintiffs

exercise of a free and informed decision.

70)     Plainly stated, "a claim of duress cannot generally be sustained where there

is knowledge of the facts, time and opportunity for investigation, deliberation and

reflection".   **Paroczay v. Hodges, 279 F.2d 439, 441 (DC. Cir.1961)**.     Agency's

Thursday morning coercion of Plaintiffs resignation, after Agency's all-day-closures

Wednesday and Tuesday evening closures after Plaintiffs 2pm, receipt of notification

to resign or be terminated, manifest just how fundamentally unfair personnel proceedings

were.    Agency knew of Wednesday, closures and moved forward with resignation.

71)     Plaintiff's claim of duress is easily sustained where Plaintiff had insufficient

knowledge of the facts, insufficient time to investigate, deliberate and reflect on the

verbal information offered during HR investigation.   There was no post investigation

meetings, no post investigation direct contacts, and no post investigation direct

communications, all communications were made over the phone.    Far more important,

Plaintiff did not have sufficient time to discuss, deliberate and reflect with

family, where his employment earnings were family's financial life jacket.

## **UNDERSTANDING NATURE OF TRANSACTION**

~~72)     Plaintiff did not receive anything is writing from Agency or union,~~

inviolate of CBA, DC Codes and Regulations, and Agency Personnel Manual.
Once Plaintiff informed Mirandi Gillis of his intent to resign and she informed Ronnie
Thaxton (See, EXHIBIT A), Plaintiff's alleged misconduct investigation ended and
Employee's Personnel Action began mandating Due Process protections such as: (1) free
and informed choice, (2) understanding of transaction, (3) reasonable amount of time to
choose and (4) alternative options to resignation; before making his free and informed
decision whether to resign or stand pat and fight misconduct allegations.      **Stanley**.

73)     Plaintiffs Personnel Action i.e., resignation process began inviolate of Due
Process, where Mirandi Gillis, Richard Allison, Ronnie Thaxton nor HR receptionist
informed Plaintiff that resignation selection would preclude administrative appeal rights.

74)     Mirandi Gillis upon coercing Plaintiff to resign (See, **FOOTNOTE #4**)
during Thursday, December 21st, 11am, telephone call, never informed Plaintiff
he would be precluding his administrative appeal rights when he resigned.

75)     Richard Allison wrote Plaintiffs resignation letter without his input, gave letter
to Plaintiff Thursday, December 21st, 2pm, instructed him to take letter to HR, but never
informed him letter precluded administrative appeal.   Plaintiff never met with Richard
Allison to offer input for resignation letter writing.      When did Richard Allison, assist
Plaintiff in writing resignation letter when time line never permitted for such assistance.

---

**FOOTNOTE #4**: Ronnie Thaxton stated, "OGC is firm with Fridays termination".
Plaintiff relied on statement and stated intentions to resign.   After resignation, Plaintiff
was informed that, "at the time of [Plaintiffs] resignation DCHA had not finalized its
investigation or approved discipline".    'Agency used deception to coerce resignation'.

76)    Mirandi Gillis informed Ronnie Thaxton, "Plaintiff had stated his

intent to resign and was on his way to your office", Ronnie Thaxton never informed

Plaintiff resignation would preclude administrative appeal.    In a sworn affidavit,

Ronnie Thaxton stated that, "I never discussed the possibility of resignation or its

potential impact on his employment benefits with [Plaintiff]".    See, (EXHIBIT B).

77)    When an employer withholds material information concerning [Plaintiffs]

right to appeal and affirmatively misrepresents his procedural rights, those actions

violate due process.  **Covington v. Dep't Of Health And Human Servs.**, **750 F.2d 937,**

**943 (Fed. Cir.1989)** (quoting, **Schbinsky v. United States**, **488 F.2d 1003, 1006 (1973).**

78)    Agency employees who voluntarily resign, formally receive

information about financial consequences, benefit options and assistance programs

related to separations from agencies other than retirement.    Absence of Exit

Interview, separation material and detailed information about alleged underlying

misconduct, left Plaintiff oblivious of the dynamics of transaction, moreover, Agency

never offered Plaintiff any written information to review.   The law requires that a

choice no matter how unpleasant, must be understood by the [Plaintiff].  **Covington**,

**at 943; Stanley, at 1178** ("law requires choice to be understood by … and freely made").

79)    "A decision made with blinder's on, based on misinformation or lack

of information cannot be binding as a matter of fundamental fairness and due process"

**Stanley**, **at 1178,** quoting **Schbinsky**, **supra**; See also, **Miller v. DC, Fire And**

**Emergency Med. Servs., Dep't**, **OEA Matter NO.: J-0103-07,** ("employee did not

understand transaction because of the lack of information regarding resignation options,

available benefits, consequences of resignation or significance of the effective date of resignation").

80)   "Agency's failure to provide [Plaintiff] with information pertinent to his decision to resign, negatively impacted his ability to make a free an informed choice, and resignation was involuntary". **Miller, supra,** quoting **Scharf v. Dep't Of the Air Force, 710 F.2d 1572, 1574 (Fed.Cir.1983).**   Without question the absence of Wednesday meeting deprived Plaintiff of the right to personally inquire and question HR personnel about financial consequences, benefit options and effective date of resignation.

81)   In **Miller,** "agency should have provided [Plaintiff] with information about the consequences of his decision; including what benefits he was entitled to, and the significance of an effective date mentioned in resignation letter".   Also, in **Miller,** "agency testified that it did not inform . . . of his resignation options, what benefits were available, what an effective date of resignation was, its significance or that . . . should indicate the effective date on his request to resign".   **Id.**   Ronnie Thaxton's affidavit (See, EXHIBIT B) states that Agency did not inform Plaintiff of resignation options.

82)   There's no evidence that any other circumstance relieved or mitigated coercion or duress Plaintiff felt from the lack of understanding of rapidly approaching transaction. Agency's call, Thursday, December 21st, 11am, added duress and coercion, when Plaintiff was told, "Agency would charge him earned leave, withdraw resignation offer and initiate criminal investigation unless Plaintiff immediately resigned". Losing $400.00, per day, possible withdrawal of resignation offer and initiation of criminal investigation increased Plaintiffs level duress.

20

83)     Plaintiff involuntarily resigned Thursday, December 21st, at approximately

2pm, three-hours after Agency's coercive 11am, call.   "The most probative evidence of

involuntariness will usually be evidence in which there is relatively short periods of time

between the employer's alleged coercive acts and the [Plaintiffs] resignation".   **Terban**

**v. Dep't Of Energy, 216 F.3d 1021, 1024 (2000).**   Agency's call established the formal

link between Agency's coercive acts and [Plaintiffs] involuntary resignation. **Id.**

84)     Ronnie Thaxton's Thursday, December 21st, 11am, telephone call should have

been mitigating by simply rescheduling Wednesday's, December 20th, 10am, meeting

scheduled by Mirandi Gillis, which did not occur because HR and Payroll Office was

closed for Agency 'Christmas Party'.

85)     Per Ronnie Thaxton's sworn affidavit: "4.  Mirandi Gillis, . . . is not an

employee of [Agency] and does not represent or have the authority to make decisions on

behalf of [Agency].  - - -  9.  I did not inform [Plaintiff's] union representatives that

[Plaintiff] would be terminated on December 21st, 2017, if he did not resign immediately,

nor that DCHA was considering criminal prosecution of [Plaintiff]".

86)     If Mirandi Gillis is not a representative of Agency and Agency never endorsed

or initiated resignation discussions, then Ronald McCoy, Paulette Campbell, Ronnie

Thaxton, Milton Dyer, and Lisa Kelly, all Agency employee's acting under color of law

were substantially involved in the gravely unfair and unlawful deprivation of Plaintiff's

property interest in continued employment during Employee Personnel Action, whereas

they acquiesced to, or otherwise failed to take the necessary steps to prevent the acts that

resulted in the unlawful conduct and the harm suffered by Plaintiff.   Each acted in

concert, and conspired with each other, with deliberate indifference to the harm, and
~~consequences of Plaintiffs protected interest in continued employment.~~

87)    Agency actions and inactions are void and Plaintiff is entitled to recover any
part of which he has been illegally deprived.   **Service v. Dullas, 354 US 363 (1957)**
("agency actions invalid because it violated regulations binding on the agency").

88)    Per Ronnie Thaxton's sworn affidavit, Mirandi Gillis was not authorized to act
on behalf of the Agency, whereas, "even if the Army recruiter made the allege oral
promise to the [Plaintiff], which . . . denies, they would not be valid in absence of proof
that the recruiter has the actual authority to make them" **Jackson v. United States, 573**
**F.2d 1189, 1197-99 (1978).**        Per Ronnie Thaxton, Mirandi Gillis did not have
Agency authorization to offer Plaintiff his resignation.  Agency process is clearly VOID !

89)    Clearly there were "gross inequities" in Agency proceedings that foreclosed
[Plaintiffs] ability to make a reasoned decision, and aborted any likelihood of gaining
an understanding worthy of making a free and informed decision.  **William v. Walker –**
**Thomas Furniture Co**., **350 F.2d 445 (1965)**; See also, **Manzi v. United States, 198**
**Ct. Cl 489, 494 (1972)** ("courts must look to whether factors operating on [Plaintiffs]
decision making process made a voluntary decision impossible").

### WAS EMPLOYEE GIVEN REASONABLE
### TIME TO CHOOSE

90)    In **Cuff v. DC, Dep't Of GSA, OEA Matter No.:1606-0009-12R17,** OEA
Board held, "**Stanley,** established that employee threatened with termination must be
given sufficient time to obtain information about financial consequences of election

for his or her choice to be informed".   See, **Stanley**, (". . . inability to obtain information from [Agency] in the time permitted about the financial consequences of election . . . substantially undermined [Plaintiffs] freedom of choice").   **Id**.

91)    After Tuesday evening, and Wednesdays all day Agency closures, Plaintiff was forced to resign Thursday, three-hours after Agency's 11am, telephone call informing Plaintiff of the additional consequence, charging him his earned leave i.e., (losing-$400.00-per-day) while awaiting his decision would occur if Plaintiff did not resign immediately coupled with the possibility of resignation offer withdrawal and initiation of criminal investigation.   Plaintiff had to make a life altering decision based on an informational disability that Agency was "wholly responsible" for.   Agency actions were fundamentally unfair, deceptive, coercive and violated Due Process.   Normally, employee's who resign are expected to provide no less than two weeks advance notice. See, DC Code, Title 14 Sec. 7111.1.

92)    Plaintiff's due diligence in attempting to ascertain pertinent information for informed and free choice is replete throughout the record however, Plaintiff was unable to retrieve or even view material information.   "Resignation involuntary when given four-hours to decide, but lacked complete picture because of agency denial of access to [investigative] report".   **Jefferson v. Harris, 170 F.Supp.3d 194 (D.D.C.2016); Arizona Dep't Of Economics Security v. Redlon, 156 P.3d 430 (2017)** ("resignation involuntary where employee told to resign or be dismissed before 12-o'clock, which gave her a few hours to decide").   See also, **Pearlman, at 932-33,** "resignation involuntary where employee given several hours to verify information integral to decision, bringing to bear the full force of time pressure".

23

**EMPLOYEE WAS NOT PERMITTED TO SELECT**
**EFFECTIVE DATE OF RESIGNATION**

93)   In **Schultz v. United States, 810 F.2d 1133, 1136 (1986)** Court held,

"resignation was not voluntary where agency imposes the terms of resignation, employee

denied freedom of choice and not permitted to select effective date or offered

alternatives".   Plaintiff was never informed of relevance of effective date and Agency

arbitrarily determined on Tuesday, December 19th, that Friday, December 22nd was

Plaintiff's deadline to decide between resignation or termination.

94)   "[Plaintiff] had control over effective date of resignation where there was no

evidence in the record suggesting that [Plaintiff] was given a deadline to decide".

**Turninski v. Wilkes – Barre, CA NO.:04-CV-1919, 2006WL 3742714, at *7 (M.D.**

**Pa. Dec. 18, 2006).**   Here, the record is clear, Agency established a deadline of

Friday, December 22nd, yet on Thursday, December 21st, Ronnie Thaxton demanded

deadline be Thursday, December 21st, or additional consequences would attach to

resignation offer.   Plaintiff didn't control selection of effective date of resignation

and still does not know how date would be consequential or nonconsequential.

**WITHHOLDING AND MISREPRESENTATION OF MATERIAL**
**INFORMATION NEEDED FOR FREE AND INFORMED DECISION MAKING**

95)   Agency responded to Plaintiffs OEA appeal on March 19th, 2018, stating, "At

the time of [Plaintiffs] resignation, DCHA had not finalized its investigation or approved

discipline".   As OGC awaited Agency's, (1) issuance of advance written report, and

(2) Plaintiff's response; on Thursday, December 21st, Ronnie Thaxton had deceptively

misrepresented material information to Plaintiff, by informing Plaintiff, that

24

"OGC was firm in its decision to issue the termination by Friday, and that [Ronnie
Thaxton] was only waiting on the Director's signature, everyone else had signed off
and I, i.e., [Ronnie Thaxton] will have remaining signature in the morning".

96)    Plaintiff relied on Ronnie Thaxtons deceptive, information and
resigned thinking that there was no way to successfully stand pat and fight, because
as Ronnie Thaxton stated, "everyone agreed that [Plaintiff] should be terminated".

97)    Plaintiff learned of misrepresentation of material information after he had
involuntarily resigned.    Where Plaintiff reasonably relied on Agency misrepresentations
Courts have held that due process was violated.  **Covington, at 943; Scharf, at 1574;
Schbinsky, at 1006.**

98)    Ronnie Thaxton further mislead and misrepresented material facts
needed for informed and free decision making by informing Lisa Kelly pre-
investigation that Agency had video and photos of Plaintiffs unauthorized gas card
purchases but never produced any videos or photos.

99)    Ronnie Thaxton, Mirandi Gillis and Richard Allison also withheld
material information, when they did not inform Plaintiff that resignation
selection would preclude administrative appeal rights. **Covington, at 943.**

100)    The withholding and misrepresentation of material information was
utilized to coerce Plaintiff into immediate resignation and Plaintiff fully relied on
misleading statements and immediately resigned.    If Agency does not deceive
Plaintiff about status of investigation, Plaintiff does not resign Thursday, December 21st,
but returns to HR and Payroll Office to have his many unanswered questions answered,
that could not be answered Tuesday evening or Wednesday because of Agency closures.

25

101)        Clearly, Agency's actions and inactions i.e., withholding, misleading and misrepresentation of material information did not have any legitimate agency purpose or interest, but simply to coerce Plaintiff into resignation under extreme duress and time pressure.    Here, Plaintiffs claim is purely objective.   What reasonable employee would fight misconduct allegations where HR informs him that "OGC is firm for Friday's termination and everyone else has signed off except Director and we will have his signature in the morning".

### WAS PLAINTIFF OFFERED ALTERNATIVE TO RESIGNATION

102)        In **Stanley**, OEA found coercive elements but employee was offered alternatives, therefore [resignation] was voluntary.    The **Stanley**, Court reversed OEA decision stating, " . . .  met his burden of showing that [resignation] was induced by other factors that, in combination, substantially undermined his freedom of choice - - - namely, his inability to obtain material information from [agency] about financial consequences of his selection". **Id.**

103)        Here the sole alternative to termination was resignation.   Plaintiff was never offered an alternative and had to accept ending his 10-year inspector career and could only choose how ending his career would occur; Resignation or Termination. Of course, there was no genuine choice or alternatives; it was rather the disguised proverbial Hobson's choice where the so-called "choice" is wholly illusory and is in fact no choice at all.  Plaintiff's only option was to lose his government career. **Baur v. Holder, 25 F.Supp.3d 842, 853 (2014).**   Plaintiff had no alternatives and one choice, which in fact, was no choice at all.

26

104)   Plaintiff was informed that, "OGC was firm on Fridays termination".   In

**Angarita v. St. Louis County, 981 F.2d 1537, 1545 (1992)** plaintiffs were told that,

"… had already decided that they would be fired and they would not leave meeting with

their jobs".   The objective reality is that, "OGC was firm for Fridays termination" is no

different from; plaintiff being told that "… had already decided that they would be fired".

Plainly stated, there absolutely was no choice for Plaintiff.

## DID PLAINTIFF HAVE ADVICE OF COUNSEL

106)   No!  Agency did not advise Plaintiff pre-investigation of his right to attain

private legal counsel for representation in violation of **Garrity v. New Jersey, 385 US**

**493 (1967).**   Plaintiff was at a disadvantage where the option of private legal counsel

was never mentioned to Plaintiff where allegations carried possible term of incarceration.

## DEMAND FOR JURY TRIAL

107)   Pursuant to **Fed.R.Civ.P.  38(b),** Plaintiff demands a trial by jury on all

issues so triable as of right.

## PRAYER FOR RELIEF

108)   WHEREFORE, Plaintiff request that this Court enter Judgment in his

favor against Defendants jointly and severally; and further assign jury to:

(a)   AWARD full back pay and full benefits back pay with interest on all
payments;

(b)   AWARD compensatory damages to be determined by a jury;

(c)   AWARD monetary damages from each Defendant to be determined by a
jury;

(d)   AWARD punitive damages where jury finds necessary.

(e)   GRANT such other and further relief as Court deems just and proper.

**AFFIDAVIT IN SUPPORT OF**
**42 USC SECTION 1983 COMPLAINT**

I, ⟨handwritten: Gerald D. Da'Vage⟩, (Gerald D. Da'Vage) do hereby declare under penalty of perjury that the following and foregoing is true and correct to the very best of my knowledge and understanding:

1) That Thursday, December 14th, 2017, 9am, Milton Dyer questioned Plaintiff in the presence of Nicky Russell (Inspectors Supervisor), about alleged unauthorized gas card usage. Plaintiff denied all allegations. Milton Dyer forwarded allegations to DCHA Human Resources (HR) for investigation and with Ronald McCoy's approval demanded Plaintiffs immediate termination.     Plaintiff received nothing in writing.

2) That Plaintiff got gas card receipts from the glove compartment of assigned vehicle and instructed union representative Richard Allison to introduce receipts as mitigating evidence during HR investigation to show the similar purchase activity or routine practice (Fed.R.Civ.P. 406: Habit; Routine Practice) of similarly situated individuals assigned to vehicle and gas card are to receive similar discipline. Richard Allison stated, "let's wait to see what HR says".

3) That Tuesday, December 19th, 2017, 8am, Milton Dyer instructed Plaintiff, "not to leave Agency; HR wants to talk to you about alleged unauthorized gas card usage".

4) That minutes later, Richard Allison called Plaintiff to inform him that Agency's union shop steward, Lisa Kelly would be accompanying [you] to HR investigation. Richard Allison did not inform Plaintiff of his right to retain private legal counsel for HR investigation representation.

5) That prior to attending HR investigation, Plaintiff informed Lisa Kelly of gas card receipts found in glove compartment and instructed Lisa Kelly to introduce gas receipts as mitigating evidence during HR investigation.

6) That Lisa Kelly was also informed pre-HR investigation that Housing Choice Voucher Programs Director, Ronald McCoy was previously assigned vehicle and gas card, in question, therefore, receipts found in glove compartment, was the result of Director Ronald McCoy's gas purchases.

7) That Plaintiff raised the Routine Practice of gas purchase activity from similarly situated employee's with '<u>gas receipts as exhibits</u>', during February, 2018, Office Of Employee Appeal (OEA) appeal process.

8) That Agency responded to routine practice claim in March 16th, 2018, Motion For Summary Disposition, pg.5, para.1, stating, "[Plaintiff] seemingly argues that [Agency] should not discipline him because others had committed the very same offense . . ."

28

9)    That Plaintiffs OEA argument regarding similar gas purchases was that similar gas purchase activity should receive similar discipline as a matter of law and fundamental fairness.

10)   That OEA did not address the merits of Plaintiffs OEA appeal because Agency was exempt from OEA review because DCHA was not an agency of the District of Columbia government.

11)   That Agency did acknowledge in OEA appeal response, that similar gas purchases were made by similarly situated Agency employees because gas receipts were attached as exhibits.

12)   That upon being informed of routine practice line of defense, before HR investigation, Lisa Kelly abruptly stated, "this is not about other employee's, especially not Mr. McCoy, it's about you; Ronnie says they have photos and video of you making unauthorized gas card purchases"

13)   That Lisa Kelly accompanied Plaintiff to Tuesday, December 19th, 10am, HR investigation for alleged misconduct and did not inform Plaintiff of his right to retain private legal counsel for representation.

14)   That Agency's Tuesday, December 19th, 10am, investigation was conducted by Ronnie Thaxton, Agency's Labor and Employee Relations Manager.   Ronnie Thaxton did not inform Plaintiff that he had a right to retain private legal counsel.

15)   That during HR investigation Ronnie Thaxton presented no physical evidence, no videos, no photos, and Plaintiff denied all unauthorized gas card usage.

16)   That HR investigation ended at approximately 11am, with Ronnie Thaxton stating, "I have all of the information that I need, I will contact you when I have reached my decision".

17)   That Plaintiff exited HR meeting, returned downstairs to inspections department, Lisa Kelly remained in HR department after investigation had concluded.

18)   That approximately 11:10am, Ronnie Thaxton entered the inspections department and entered Milton Dyers office carrying the very same folder used to take notes and ask Plaintiff questions during Plaintiff's HR investigation, and held a five-to-ten-minute-closed-door meeting with Plaintiffs immediate supervisor; initiator of HR investigation and recommender of Plaintiff's immediate termination.

19) That Plaintiff raised the exparte communications inviolate of due process in OEA appeal; Agency acknowledged meeting occurred in February, 2018, appeal response, however, Agency was exempt from OEA review, therefore, merits of Plaintiffs exparte communications was never addressed by an administrative body.

20) That post investigation, Plaintiff received nothing in writing and had no direct contact or direct communications with Ronnie Thaxton or Lisa Kelly explaining the nature of the post investigation procedures that awaited Plaintiff.

21) That Tuesday, December 19th, 2pm, Mirandi Gillis called Plaintiff stating:
"I just talked to Ronnie, on Friday [December 22nd], they are going
to serve termination papers on you unless you resign before that.
If you do not resign before Friday, you will be immediately suspended
for 30-days, unpaid administrative leave pending a criminal investigation.
If they find you guilty, they will seek criminal prosecution and try to send
you to jail - - - it will affect your pension/retirement benefits, health/life
insurance benefits and you will not be able to receive any unemployment
or another government job, if you do not resign by Friday - - - however,
they are saying, also, that if you resign immediately before Friday, they
will give you 30-days paid administrative leave and a clear HR file, that
way you can get another government job".

22) That 2pm, telephone conversation continued with Plaintiff asking Mirandi Gillis, "do I call my supervisor and let him know that I will not be reporting to work ?". Mirandi Gillis responded, "No, they know that you will not be returning to work - - - I'm going to schedule a meeting with Ronnie tomorrow morning [Wednesday, December 20th] 10am, at HR and Payroll Office to officially address the questions that you have raised"

23) That after 2pm, telephone conversation with Mirandi Gillis, Plaintiff completed his daily inspections, returned to Agency headquarters, uploaded daily reports then attempted to ascertain information from HR and Payroll Office regarding financial and benefit option consequences of rapidly approaching deadline, but Agency HR and Payroll Office had closed for the day.

24) That on Wednesday, December 20th, 10am, the very next morning, Plaintiff again came to Agency and attempted to ascertain information from HR and Payroll Office, but Agency was closed for its 'Christmas Party'.

25) That Thursday, December 21st, 11am, Mirandi Gillis called Plaintiff stating, "If you do not go to the office today and turn in your resignation letter, HR will start to charge you your earned leave or may even withdraw resignation offer and initiate a criminal investigation".

26) That Mirandi Gillis informed Plaintiff that she would call Ronnie Thaxton to see what other options were available other than termination.

27) That Mirandi Gillis returned to the telephone stating, "Ronnie informed me that the Office of General Counsel (OGC) was firm in its decision to issue termination by Friday and that he was only waiting on the Director signature, but everyone else had signed off and he would have the remaining signature on Friday.   The only other option [Plaintiff] has was to resign his position, other than that, they were moving forward with Friday's scheduled termination".

28) That Agency Office of General Counsel responded to Plaintiffs March 16th, 2018, OEA appeal stating, "At the time of [Plaintiffs] resignation, DCHA had not finalized its investigation or approved of discipline".

29) That Plaintiff's Thursday, December 21st, 11am, telephone conversation continued with Plaintiff stating to Mirandi Gillis, "I do not know how to write a resignation letter" and Mirandi Gillis stated, "union representative Richard Allison will write your resignation letter, all you have to do is sign it and take it upstairs to HR; Richard is waiting on you".

30) That Mirandi Gillis did not inform Plaintiff that resignation selection would preclude administrative appeal rights.

31) That Thursday, December 21st, 2pm, Plaintiff arrived at Agency union office received resignation letter from Richard Allison, sign letter, took it upstairs to HR and resigned with thirty-days administrative leave.   Plaintiffs resignation became effective January 19th, 2018.

32) That Richard Allison did not inform Plaintiff that resignation selection would preclude the filing of an administrative appeal.

33) That HR receptionist received Plaintiffs resignation letter, there was no Exit Interview and no Notification of Personnel Action Form 50 issued to Plaintiff.

34) That HR receptionist that received Plaintiffs resignation letter did not inform Plaintiff that resignation selection would preclude administrative appeal rights.

35) That Plaintiff had no direct contact or direct communications with Mirandi Gillis. All communications between Plaintiff and Mirandi Gillis were over the telephone.

36) That Plaintiff never met Mirandi Gillis at her Office during any relevant times herein.

37)   That Plaintiff did not assist Richard Allison in the writing of Plaintiffs resignation letter. That Richard Allison authored Plaintiff's resignation letter without any input from Plaintiff.

38)   That Mirandi Gillis never asked Plaintiff anything regarding challenging alleged misconduct allegations, her sole focus was on Plaintiffs immediate resignation.

39)   That Mirandi Gillis never stated to Plaintiff, "If you are not guilty do not resign, the union will do whatever it needs to do".

I _____, (Gerald D. Da'Vage) pursuant to **Title 28 USC Section 1746** do

hereby declare under penalty of perjury that the foregoing is true and correct to the very best

of my knowledge.   Executed on this ____4th____ day of ____MAY____, 2021.

Gerald D. Da'Vage
7110 Foster Street
District Heights, Md.,
                  20747-2310
Email: nabi.dgd@gmail.com
Cell Ph.#: 202-891-1455

32

## CERTIFICATE OF SERVICE

I _____, (Gerald D. Da'Vage) certify that the attached **Title 42**

**USC Section 1983** Civil Complaint was sent by United States Postal Service Mail on

this __4th__ day of ____MAY____, 2021, to:

Office of the General Counsel
District of Columbia
Housing Authority
1133 North Capitol Street, NE
        SUITE #210
Washington, DC   20002


Ronald McCoy
Paulette Campbell
Ronnie Thaxton
Mirandi Gillis