## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GERALD D. DA'VAGE,<br><br>    *Plaintiff*,<br><br>v.<br><br>DISTRICT OF COLUMBIA HOUSING<br>AUTHORITY, *et al.*,<br><br>    *Defendants*. | Civil Action No. 21-1318 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Gerald Da'Vage, proceeding *pro se*, brings this wrongful termination action against the District of Columbia Housing Authority ("DCHA"), several DCHA officials, and the president of the union that represents DCHA employees, Miranda Gillis. Dkt. 1.[1] Da'Vage alleges that he was a for-cause employee of DCHA but that (1) he was denied due process when he resigned under duress in the midst of a "gravely unfair investigation" into his conduct, *id.* at 6 (Compl. ¶ 3), and (2) Gillis did not adequately represent his interests during that investigation, *id.* at 17–18 (Compl. ¶¶ 55–57). He brings this suit under 42 U.S.C. § 1983 to collect back pay and other damages. *Id.* at 32 (Compl. ¶ 108).

---

[1] Although the complaint spells Gillis's first name "Mirandi," *see*, *e.g.*, Dkt. 1 at 5, Gillis has clarified that the correct spelling is "Miranda," Dkt. 15-1 at 8 n.1, which Da'Vage has since adopted, *see* Dkt. 21 at 1.

DCHA and the two of the three named DCHA defendants move to dismiss, Dkt. 12, as does Gillis, Dkt. 15.[2]  For the reasons that follow, the Court will **DENY** the DCHA defendants' motion to dismiss and **GRANT** Gillis's motion to dismiss.

## I.  BACKGROUND

Both the DCHA defendants and Gillis move to dismiss Da'Vage's complaint for failure to state a claim.  *See* Dkt. 12; Dkt. 15.[3]  For purposes of evaluating those motions, the following allegations, which are taken from Da'Vage's complaint, are accepted as true.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The Court will also consider the "affidavits," including one from Gillis and one from a named DCHA defendant, Ronnie Thaxton, *see* Dkt. 1-1,[4] that Da'Vage attached to his complaint, *see EEOC v. St. Francis Xavier Parochial*

---

[2]  At the time these motions were filed, the third named DCHA defendant, Ronald McCoy, had not yet appeared in this matter.  In their motion to dismiss—filed on August 6, 2021—the other DCHA defendants asserted that McCoy had not been served.  Dkt. 12 at 1 n.1. The Court, accordingly, issued an order directing Da'Vage to serve McCoy and to file proof of service on or before September 3, 2021.  *See* Dkt. 13.  Da'Vage filed proof of service on September 3, 2021, indicating that McCoy had been personally served on June 30, 2021, *see* Dkt. 19, before the DCHA defendants had filed their motion to dismiss.  In light of the parties' conflicting representations, the Court ordered counsel for DCHA to file a status report indicating whether he represents McCoy in this matter.  *See* Min. Order (Jan. 19, 2022).  That status report indicated that, as of January 27, 2022, counsel for DCHA also represents McCoy.  *See* Dkt. 27.  But because McCoy was not represented at the time the DCHA defendants' pending motion to dismiss was filed, the Court will not consider the arguments made therein as to McCoy.  Instead, the Court will consider those arguments as to the DCHA defendants who had counsel at the time of filing, whom the Court will refer to as the "DCHA defendants."

[3] As detailed below, Gillis also raises an exhaustion argument which she styles as a jurisdictional basis for dismissal, pursuant to Rule 12(b)(1).  *See* Dkt. 15-1 at 13–21.  But because the Court concludes that this issue does not, in fact, implicate its jurisdiction to hear this case, the Court will treat that argument as another contention that Da'Vage has failed to state a claim.

[4]  Although captioned "affidavit," the Gillis statement is not made under the penalty of perjury and is neither a sworn "affidavit" nor an unsworn "declaration" made pursuant to 28 U.S.C. § 1746.  The Thaxton "affidavit," in contrast, is made under the penalty of perjury and is thus consistent with 28 U.S.C. § 1746.

*Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice.").

## A.     Factual Background

Da'Vage worked as a construction and housing inspector for DCHA for roughly ten years. *See* Dkt. 1 at 12, 31 (Compl. ¶¶ 29, 103).  Although the complaint is not entirely clear on this point, it appears that the events underlying the current dispute began when DCHA opened an investigation in late 2017 into allegations of "unauthorized gas card usage" by Da'Vage during his time with DCHA.  *Id.* at 7 (Compl. ¶ 8).  According to Gillis's "affidavit," this investigation began in November 2017 because the gas card in question "was shown to have expenditures far exceeding the expenditures on other cards that had been issued to other employees and [because] some of the purchases had been made after work hours."  Dkt. 1-1 at 1 (Gillis Aff. ¶ 1). Da'Vage learned of this investigation on Thursday, December 14, 2017, when his immediate manager "questioned [him] about unauthorized gas card usage."  Dkt. 1 at 7 (Compl. ¶ 8); *see also id.* at 33 (Da'Vage Aff. ¶ 1).

Five days later, on Tuesday, December 19, 2017, Da'Vage met with DCHA's human resources department regarding the accusations against him.  *Id.* at 8–9 (Compl. ¶¶ 10–12).  A union representative—DCHA's "union shop steward"—accompanied Da'Vage to this meeting. *Id.* at 33 (Da'Vage Aff. ¶¶ 4-5).  Da'Vage wanted to introduce "receipts . . . to show similar purchase activity . . . [by] similarly situated individuals," *id.* at 33 (Da'Vage Aff. ¶ 2), but the union representative declined to do so, because the investigation focused on Da'Vage's conduct, rather than other employees' conduct, *id.* at 8 (Compl. ¶¶ 12–13).  Neither the union representative nor the DCHA employee who conducted the meeting advised Da'Vage "of his

right to retain private counsel," according to the complaint.  *Id.* at 8–9 (Compl. ¶¶ 14–15).

Later that same day, Gillis—the president of Da'Vage's union—called Da'Vage to inform him that DCHA intended to "serve termination papers" on him.  *Id.* at 10 (Compl. ¶ 19). Prior to this call, she had spoken with DCHA's labor and employee relations manager, Ronnie Thaxton.  Dkt. 1-1 at 1 (Gillis Aff. ¶ 3).  Thaxton told her that "the investigation had concluded" and that DCHA "would be issuing . . . a notice of termination" that Friday, December 22, 2017. *Id.*  This decision was based, Thaxton explained, on "the findings of the investigation . . . coupled with the fact" that Da'Vage had been suspended for "[d]ishonesty" for three days on November 3, 2017, "for driving [a] government vehicle in Maryland and having an unauthorized passenger in the vehicle."  *Id.*

When relaying this information to Da'Vage, Gillis explained that if he did not immediately resign, he would be subject to a 30-day, unpaid administrative suspension "pending a criminal investigation."  Dkt. 1 at 10 (Compl. ¶ 19).  The criminal investigation, Gillis continued, might result in a criminal prosecution and a term of imprisonment, which would impact his pension and retirement benefits, his health and life insurance benefits, his ability to collect unemployment payments, and his further job prospects.  *Id.*  But if Da'Vage resigned immediately, Gillis told him, he would receive "30-days paid administrative leave and a clear HR file," which would enable Da'Vage to "get another government job."  *Id.*  According to Gillis's "affidavit," however, "[a]t no time did [she] tell Mr. [Da'Vage] that Mr. Thaxton informed me that the agency was pursuing criminal charges," and "[a]t no time did [she] tell Mr. Da'Vage that he would be placed on unpaid administrative leave."  Dkt. 1-1 at 2 (Gillis Aff. ¶ 4). Instead, Gillis states that she informed Da'Vage only that "any unauthorized use of the card is theft and that depending on the amount the agency had the right to pursue criminal charges."  *Id.*

Thaxton's affidavit similarly asserts that he "did not inform Mr. Da'Vage's union representative[] that Mr. Da'Vage would be terminated . . . if he did not resign immediately, []or that DCHA was considering criminal prosecution of Mr. Da'Vage." *Id.* at 4 (Thaxton Aff. ¶ 9).

Regardless of the precise contents of this conversation, according to the complaint, Da'Vage spent the next day and a half "attempt[ing] to [obtain] information from HR and Payroll Office about the financial consequences of [his] rapidly approaching decision." Dkt. 1 at 10–11 (Compl. ¶¶ 21). When Da'Vage attempted to stop by the office on the afternoon of December 19, however, he discovered the office had closed for the day, and when he returned the next morning, the office was again closed, this time "for its 'Christmas Party.'" *Id.* at 10–11 (Compl. ¶¶ 21–22).

Gillis called him again on Thursday, December 21, 2017. Gillis warned him that, "[i]f you do not go to the office today and turn in your resignation letter, HR will start to charge you your earned leave and may even withdraw [the] resignation offer and initiate a criminal investigation." *Id.* at 11 (Compl. ¶ 23). She briefly got off the phone to consult with Thaxton "to see what other options were available," only to report that, according to Thaxton, DCHA's Office of General Counsel indicated that the agency "was firm in its decision" and that Da'Vage would receive his termination letter the very next day. *Id.* (Compl. ¶ 24). According Gillis, she also told him "that if he was not guilty[,] do not resign" because "the union will do whatever it needs to do," and she explained that if he would like to resign, "he had to do it prior to the issuance of the notice [of termination] if he did not want the discipline in his folder" and if he wanted to receive 30 days of medical benefits. Dkt. 1-1 at 2 (Gillis Aff. ¶ 6).

Da'Vage indicated that he wished to resign. Dkt. 1 at 12 (Compl. ¶ 26). Gillis did not, however, inform Da'Vage that "resignation . . . would preclude administrative appeal." *Id.* at

11–12 (Compl. ¶ 25).  Da'Vage told Gillis that "he did not know how to write a resignation letter," and so Gillis arranged for a union representative to draft Da'Vage's resignation letter, which Da'Vage signed and delivered to the human resources department.  *Id.* at 11–12 (Compl. ¶¶ 26–28).  Neither the union representative nor the human resources department, however, informed Da'Vage that resignation "would preclude the filing of an administrative appeal."  *Id.* (Compl. ¶¶ 27–28).  According to Gillis, Da'Vage continued to receive pay until his resignation became effective on January 19, 2018.  Dkt. 1-1 at 2 (Gillis Aff. ¶ 7).

**B.     Procedural History**

Da'Vage, proceeding *pro se*, filed this action on May 5, 2021.  Brought under 42 U.S.C. § 1983, the suit seeks "full back pay and full benefits back pay with interest," along with compensatory and punitive damages.  *Id.* at 7, 32 (Compl. ¶¶ 6, 108).

The crux of Da'Vage's complaint against DCHA and the other named DCHA defendants is that he was entitled to further process during the investigation of his alleged misconduct, but that no DCHA official ever apprised him of these rights.  Da'Vage alleges, for example, that Paulette Campbell, DCHA's director of human resources, "knew or reasonabl[y] should have known that Plaintiff did not receive minimal Due Process protections" and that Ronald McCoy, a direct supervisor who oversaw his immediate manager, either knew or "should have known" that Da'Vage never received "advanced written notice"—presumably, of the charges against him, although the complaint does not specify—or an "opportunity to be heard after receiving advanced written notice or pretermination hearing results."  *Id.* at 13–14 (Compl. ¶¶ 32–34, 38).  Da'Vage further alleges that Ronnie Thaxton, DCHA's labor and employee relations manager, (1) "did not advise Plaintiff of his right to retain private counsel" during the investigation; (2) misrepresented the evidence that the agency had against Da'Vage; (3) failed to inform Da'Vage

that resigning "would preclude administrative appeal rights,"; and (4) failed to provide Da'Vage with documents relevant to the investigation.  *Id.* at 15–16 (Compl. ¶¶ 42–46).

As for Gillis, Da'Vage alleges that she "knew or reasonably should have known" that he did not receive "advance written notice" or "time to meaningfully review and respond" to DCHA's allegations against him.  *Id.* at 18 (Compl. ¶ 55).  Gillis pressured Da'Vage to make a decision regarding his resignation, according to Da'Vage, even though she "knew [he] was at an informational disadvantage," and she "allowed [him] to resign without advising [him] that resignation would preclude administrative appeal rights."  *Id.* (Compl. ¶ 57).  Gillis's conduct amounted to a violation of procedural due process, Da'Vage alleges, because he was left without the "informational weaponry" to make an "informed and free decision" regarding his resignation.  *Id.* at 20 (Compl. ¶ 64).

DCHA and the named DCHA defendants jointly filed a motion to dismiss on August 6, 2021, Dkt. 12, and Gillis followed suit with a separate motion to dismiss on August 23, 2021, Dkt. 15.  The Court ordered Da'Vage to respond to each motion, warning him of the consequences of failing to do so.  *See Fox-Neal* Order (Aug. 16, 2021) (addressing motion to dismiss from the DCHA defendants); *Fox-Neal* Order (Aug. 24, 2021) (same for Gillis's motion to dismiss).  Da'Vage has opposed both motions, *see* Dkt. 17; Dkt. 20, and both sets of defendants have filed reply briefs in further support of their motions, *see* Dkt. 18; Dkt. 22.[5]

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In

---

[5] While those motions were pending, Da'Vage moved for summary judgment.  Dkt. 23.  DCHA has moved to strike that motion as premature, Dkt. 25, and Da'Vage's reply brief was due January 14, 2022, *see* Min. Order (Dec. 29, 2021).  That date has come and gone, and to date the

evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (citation omitted).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Id.* at 555–56.  In assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

### III.  ANALYSIS

Two motions to dismiss are before the Court—the first filed jointly by DCHA and the other named DCHA defendants, Dkt. 12, and the second filed separately by Gillis, Dkt. 15.  The Court will address each in turn.

### A.    DCHA's Motion to Dismiss

The DCHA defendants move to dismiss Da'Vage's complaint for failure to state a claim.

---

Court has not received a reply brief.  The Court, accordingly, concludes that Da'Vage's motion is ripe for resolution and will deny his motion for summary judgment as premature.  Discovery has not yet begun, as this case remains at the pleading stage, and as such the Court is not yet in a position to evaluate the state of the record and any genuine disputes of material fact.

*See* Dkt. 12 at 11.  Da'Vage's complaint, as noted above, alleges only one claim, a deprivation of his constitutional right to procedural due process in violation of 42 U.S.C. § 1983.  Dkt. 1 at 19 (Compl. ¶ 58); *see id.* at 4 (identifying § 1983 as basis for suit).  To prevail on such a claim, Da'Vage must plausibly allege both that he was deprived of "life, liberty, or property," and that "the procedures used by the Government in effecting the deprivation [did not] 'comport with due process.'"  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  The DCHA defendants concede that Da'Vage "had a constitutionally protected property right" in his continued employment, Dkt. 12 at 5, but they offer two reasons why Da'Vage's procedural due process claim nevertheless fails.  As detailed below, neither warrants dismissal of Da'Vage's complaint at this stage.

### 1.   *Voluntary Resignation*

First, the DCHA defendants argue that when someone, like Da'Vage, "resigns from a position in which he has a constitutionally protected property interest," he "cannot argue that he has been deprived of due process because[,] by resigning[,] he has chosen not to avail himself of the due process rights and procedures to which he was entitled."  *Id.* (citing *Stone v. Univ. of Md.*, 855 F.2d 172, 173 n.7 (4th Cir. 1988)).  The Court agrees that "if an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred." *Narotzky v. Natrona Cty. Mem'l Hosp. Bd. of Trustees*, 610 F.3d 558, 564 (10th Cir. 2010).  This is because, when an employee "resign[s] of his own free will[,] . . . he relinquishe[s] his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause."  *Stone*, 855 F.2d at 173.

That rule, however, comes with an important caveat: it applies only when the employee resigns of his own free will.  In contrast, when an employee's resignation is made under duress or is otherwise involuntary, his resignation is "effectively a termination."  *Jefferson v. Harris*, 170 F. Supp. 3d 194, 208 (D.D.C. 2016) (quoting *Keyes v. District of Columbia*, 372 F.3d 434, 438 (D.C. Cir. 2004)).  Although an employee's resignation is "presumed to be voluntary," *Hill v. Gray*, 28 F. Supp. 3d 47, 61 (D.D.C. 2014), this presumption does not apply if "a reasonable person in [the plaintiff's] position would have felt compelled to resign under the circumstances," *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010).  A resignation may be involuntary for purposes of this analysis, for example, (1) "where [it was] forced by the employer's duress or coercion;" or (2) "where [it was] obtained by the employer's misrepresentation or deception." *Stone*, 855 F.2d at 173 (collecting cases); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 233 n.10 (3d Cir. 2006); *Jefferson*, 170 F. Supp. 3d at 208.  The question posed at the motion to dismiss stage is simply whether the complaint alleges a claim that is "plausible on its face"—that is, a claim that the plaintiff (1) relinquished his position under duress or based on his employer's misrepresentations, and (2) was deprived of his job without the benefit of due process.  *See Iqbal*, 556 U.S. at 675, 678.

Although Da'Vage argues that both of these circumstances are present here, his allegations that DCHA obtained his resignation by "misrepresentation by deception," *Stone*, 855 F.2d at 173, are sufficient to resolve the matter at this early stage of the proceeding.  To succeed on this theory, Da'Vage must plausibly allege that his resignation was "induced by [his] reasonable reliance on [DCHA's] misrepresentation of a material fact concerning the

resignation." *Keyes*, 372 F.3d at 440.  A misrepresentation is "material" if it "concern[s] the consequences of [Da'Vage's] resignation or the alternatives thereto." *Id.*

According to Da'Vage, Ronnie Thaxton "withheld and/or misrepresented material information" when he told Gillis (who was acting as Da'Vage's agent and subsequently informed Da'Vage) that DCHA had made a "firm" decision to terminate Da'Vage on December 22, 2017, and that his "only other option was to resign" before then.  Dkt. at 1 at 16 (Compl. ¶ 47).  On Thursday, December 21, 2017, Gillis allegedly relayed to Da'Vage Thaxton's message that, if he did not resign before his impending termination, DCHA "would charge him earned leave, withdraw [its] resignation offer[,] and initiate [a] criminal investigation." *Id.* at 25 (Compl. ¶ 82).  Through these statements, Da'Vage alleges, Thaxton "deceptively misrepresented material information to Plaintiff"—namely, by "informing Plaintiff that [DCHA] was firm in its decision to issue the termination by Friday, and that . . . Thaxton was only waiting on the Director's signature," which Thaxton expected to receive the next morning (that is, Friday, December 22, 2017).  *Id.* at 29–30 (Compl. ¶ 95) (alterations and quotation marks omitted).  According to Plaintiff, he learned that Thaxton's representations were false only when, in the course of a failed administrative appeal in March 2018, DCHA asserted that, "[a]t the time of [Plaintiff's] resignation, DCHA had not finalized its investigation or approved discipline." *Id.* at 29 (Compl. ¶ 95).  Da'Vage further alleges that he "relied" on Thaxton's "deceptive" statements that "everyone agreed that [he] should be terminated" and ultimately came to believe "that there was no way to successfully stand pat and fight." *Id.* at 30 (Compl. ¶ 96).  Relying on this "misrepresentation of material information," Da'Vage "immediately resigned." *Id.* (Compl. ¶ 100).  If, according to Da'Vage, DCHA had not "deceive[d]" him about the "status of [his] investigation," he would not have resigned on December 21, 2017, but instead would have

"return[ed] to HR and Payroll Office to have his many unanswered questions answered." *Id.*

These allegations are sufficient to render Da'Vage's claim that DCHA induced his resignation through misrepresentation or deception at least "plausible on its face," *Blue*, 811 F.3d at 20. As an initial matter, there can be little dispute that the statements at issue "concern[ed] the consequences of [Da'Vage's] resignation or the alternatives thereto," *Keyes*, 372 F.3d at 440, and were, as a result, material to his resignation. Thaxton's alleged message to Gillis, after all, was that if Da'Vage did not resign immediately, DCHA "would charge him earned leave, withdraw [its] resignation offer[,] and initiate [a] criminal investigation." Dkt. 1 at 25 (Compl. ¶ 82). The Court, accordingly, cannot agree with the DCHA defendants' position that these statements "did not concern the consequences of [Da'Vage's] resignation or the alternative to [Da'Vage's] resignation." Dkt. 12 at 10. Although the DCHA defendants maintain that these statements concerned only Da'Vage's termination, rather than his resignation, *see id.*, that is a false dichotomy. Da'Vage alleges DCHA gave him a stark, and immediate, choice—resign or be fired the very next day—and that this choice implicated, among other things, his access to earned leave and a potential criminal investigation. Dkt. 1 at 25 (Compl. ¶ 82). That choice, even under the DCHA defendants' framing, plainly went to the "consequences of . . . [Da'Vage's] alternatives" to resignation. *Keyes*, 372 F.3d at 440.

Although the DCHA defendants do not address this point, it is perhaps a closer question whether those statements were, as alleged, misleading or deceptive. Da'Vage's argument that he resigned under duress—the other basis on which he maintains his resignation was involuntary—depends on a "Hobson's choice" between resignation or termination. *Id.* at 31 (Compl. ¶ 103). But it is entirely plausible that Da'Vage perceived such a "Hobson's choice" where none existed if, as Da'Vage alleges, Thaxton misled Gillis (and, in turn, Da'Vage) as to the imminence of his

12

termination.  Another wrinkle is that Thaxton, in the affidavit Da'Vage attached to his complaint, asserts that he "did not inform Mr. Da'Vage's union representative that Mr. Da'Vage would be terminated on December 21, 2017, if he did not resign immediately, []or that DCHA was considering criminal prosecution of Mr. Da'Vage."  Dkt. 1-1 at 4 (Thaxton Aff. ¶ 9).  As an initial matter, there is no reason to believe that Da'Vage intended to concede the truthfulness of Thaxton's statements by attaching his affidavit to the complaint.  To the contrary, Da'Vage clearly alleges that he "relied on Ronnie Thaxton['s] deceptive information," including Thaxton's statement that "everyone agreed that [Da'Vage] should be terminated" and statement that DCHA was "only waiting on the Director's signature," which he expected to receive the next "morning."  *Id.* at 29–30 (Compl. ¶¶ 95–96).  In light of these allegations, the Court understands Da'Vage's position to be that Thaxton's denials in his affidavit—to the extent they must be reconciled with the contents of Da'Vage's complaint—only underscore the falsity of the statements Thaxton allegedly made to Gillis on December 21, 2017.  The complaint is, admittedly, less than clear on this point, but at this stage the Court must draw all reasonable inferences in favor of Da'Vage, as the non-movant, *see Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 27 (D.D.C. 2018), and must also take into consideration the liberal pleading standard afforded litigants, like Da'Vage, who are not represented by counsel, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

With these principles in mind, the Court concludes that Da'Vage has adequately pleaded that DCHA induced his resignation through misrepresentation or deception, rendering his resignation involuntary.  The DCHA defendants are, accordingly, not entitled to dismissal on the ground that Da'Vage voluntarily surrendered his property interest in his continued employment. They may, of course, return to these issues at the summary judgment stage.

2. *Sufficiency of Process*

The DCHA defendants also argue that, even if Da'Vage was deprived of a property interest, he received all of the process to which he was constitutionally entitled.  Due process did not require, according to the DCHA defendants, that "the DCHA give Mr. Da'Vage the full panoply of process due in a contested administrative hearing or judicial proceeding" at the pre-termination stage, and thus, prior to his resignation, Da'Vage did not have the "right to proceed before a neutral adjudicator, [to] be represented by counsel, [to] receive written notice of the issues to be adjudicated, [to] view evidence, [to] present and cross-examine witnesses and thereafter [to] appeal a final decision."  Dkt. 12 at 10–11; *see also* Dkt. 18 at 2–3.  Instead, they argue, "at the pre-termination stage, all that due process requires is that a tenured public employee, such as Da'Vage, receive oral or written notice of the charges against him, an explanation of the employer's evidence[,] and an opportunity to present a rebuttal."  Dkt. 12 at 11.  According to the DCHA defendants, that is the process Da'Vage received, and thus, in their view, he "received the pre-termination process [to which] he was due."  *Id.*

Where, as here, an employee has a protected property interest in his employment by a government actor, termination must "be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)); *see also Wash. Teachers' Union Local #6 v. Bd. of Educ.*, 109 F.3d 774, 780 (D.C. Cir. 1997).  The pretermination hearing, however, "need not be elaborate" and, "[i]n general, 'something less' than a full evidentiary hearing is sufficient."  *Loudermill*, 470 U.S. at 546 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 343 (1976)).  Because "nothing in due process law require[s] . . . an evidentiary hearing before a neutral arbiter prior to termination," the DCHA was required to

14

provide only "an opportunity to present reasons why the proposed action should not be taken." *Washington Teachers' Union*, 109 F.3d at 779 (quotation marks omitted).

Applying these principles here, the Court agrees that the DCHA was not required to provide Da'Vage with the full panoply of process prior to his termination.  The difficulty for the DCHA defendants, however, is that Da'Vage alleges that he was rushed into resigning by the threat of imminent termination before he received even that minimal process required pre-termination.  At the time of his resignation, Da'Vage alleges that he had "insufficient knowledge of the facts" underlying the accusations against him.  Dkt. 1 at 22 (Compl. ¶ 71).  The information that Da'Vage allegedly sought (but never received) included "date of purchases, locations, times, etc." for his unauthorized gas card purchases.  *Id.* at 20 (Compl. ¶ 64).  Without this information, Da'Vage maintains that he could not "compare[]" the alleged purchases "to [the] inspection schedule and gas receipts found in [the] glove compartment of [his] assigned vehicle;" could not show that similarly situated employees "were not terminated" under similar circumstances; and, thus, could not fully defend himself against the charges of impropriety levied by DCHA.  *Id.*  These allegations are sufficient to make out a claim that Da'Vage was denied adequate "notice" of the charges against him and was denied a reasonable opportunity to respond to those charges.  *Loudermill*, 470 U.S. at 546.

Nor is the Court persuaded by the DCHA's defendants' contention, Dkt. 12 at 10–11; Dkt. 18 at 2–3, that Da'Vage received a "hearing appropriate to the nature of the case," *Loudermill*, 470 U.S. at 546.  In support of this argument, the DCHA defendants point to the meeting Da'Vage had with the agency's human resources department on Tuesday, December 19, 2017.  Dkt. 18 at 2.  Da'Vage alleges, however, that even with that meeting he had "insufficient time to investigate, deliberate[,] and reflect on the verbal information offered during the HR

investigation" on Tuesday, December 19, 2017.  Dkt. 1 at 22 (Compl. ¶ 71).  And, although an employee's pre-termination hearing "need not be elaborate" and "a full evidentiary hearing" is not required, *Loudermill*, 470 U.S. at 546, Da'Vage alleges that he was forced to resign in less than two-days' time, without receiving a reasonable opportunity to investigate the charges against him or to present his case, Dkt. 1 at 20 (Compl. ¶ 64); Dkt. 1 at 33-36 (Da'Vage Aff'd).  Those allegations suffice to survive a motion to dismiss.

The DCHA defendants argue in reply that Da'Vage "resigned and thereby waived his right to written notice and an adversarial proceeding to contest his termination."  Dkt. 18 at 2–3.  That, however, puts the cart before the horse.  It is only where an employee voluntarily resigns that he forfeits his procedural due process rights.  *Narotzky*, 610 F.3d at 564; *Stone*, 855 F.2d at 173.  But, when a for-cause employee plausibly alleges that his resignation was involuntary, as Da'Vage does here, he remains entitled to constitutionally sufficient process.

\*     \*     \*

Because Da'Vage's factual allegations are presumed true at this early stage of the proceeding, and because neither of the arguments pressed by the DCHA defendants is convincing in the face of that permissive standard, the Court will deny their motion to dismiss.

## B.      Gillis's Motion to Dismiss

Gillis raises several arguments in support of her separate motion to dismiss, including that this Court's lacks jurisdiction over Da'Vage's claims, Dkt. 15-1 at 13–21, and that the Da'Vage fails to a state a claim against her under 42 U.S.C. § 1983 because his complaint does not allege that she was a state actor or that she was acting under color of state law, *id.* at 23–25.

Gillis's jurisdictional argument is predicated on the District of Columbia Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601.01, *et seq.*  The CMPA "establish[es]

impartial and comprehensive administrative or negotiated procedures for resolving employee grievances" for employees of the District of Columbia, D.C. Code Ann. § 1-601.02 (a)(5), and it "provides the exclusive remedy for claims falling within its ambit," *Stockard v. Moss*, 706 A.2d 561, 567 (D.C. 1997). This means that this Court "is not an alternative forum in this scheme, but rather serves as a last resort for reviewing decisions generated by CMPA procedures." *Washington v. DCHA*, 170 F. Supp. 3d 234, 239 (D.D.C. 2016) (quoting *Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000)). Gillis argues that Da'Vage failed to avail himself of these procedures and that this Court, accordingly, cannot review his claims.

The DCHA defendants, however, attach to their motion to dismiss a decision from the District of Columbia's Office of Employee Appeals ("OEA"), concluding that the DCHA is an "*independent authority* of the District Government [with] a *legal existence separate from District government*." Dkt. 12-2 at 4 (alteration in original) (quoting D.C. Code § 6-202(a)). The OEA concluded, accordingly, that the DCHA falls outside the ambit of the CMPA and that the OEA "lack[ed] jurisdiction" over the dispute between Da'Vage and the DCHA. *Id.* at 5. Gillis does not address this decision at all, even though the DCHA defendants argue (albeit only briefly) that "DCHA [e]mployees are not employees of the District of Columbia Government," Dkt. 12 at 11, an argument that would seem to undermine Gillis's contention that Da'Vage's failure to exhaust his remedies under the CMPA precludes this lawsuit.[6]

---

[6] Although the OEA decision might be one of those "matters of which [the Court] may take judicial notice," St*. Francis Xavier Parochial Sch.*, 117 F.3d at 624, the Court need not invoke that principle here for two reasons. First, Da'Vage references the OEA decision, and its conclusion that the DCHA is "not an agency of the District of Columbia government," in his complaint. Dkt. 1 at 9 n.2 (Compl. ¶ 16 n.2) (describing finding during "OEA appeal" that DCHA "was not an agency of the District of Columbia government"). Accepting that allegation as true, it is unclear what else, if anything, Da'Vage could have done to exhaust his available administrative remedies. Indeed, the DCHA defendants maintain that Da'Vage appealed the OEA decision to the D.C. Superior Court. Dkt. 12 at 4. Second, as explained below, the Court

As noted above, Gillis characterizes this defect as going to this Court's subject matter jurisdiction, Dkt. 15-1 at 13, arguing that the Court must turn first to the CMPA exhaustion requirement before addressing the other grounds on which she seeks dismissal.  To the extent the requirement is indeed jurisdictional, Gillis is correct; except under highly unusual circumstances, courts must assess their jurisdiction "as a threshold matter" because, without jurisdiction, courts are powerless to act.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).  Gillis, moreover, points to at least some authority from this Court holding that the CMPA poses a jurisdictional hurdle even in actions brought in federal court.  *See Owens v. District of Columbia*, 923 F. Supp. 2d 241, 252 (D.D.C. 2013) (holding that plaintiff's failure to pursue her CMPA remedies meant that "this Court lack[ed] subject matter jurisdiction to review [plaintiff's] § 1983 claim").  But those decisions at least arguably represent the kind of "drive-by jurisdictional rulings" that should be treated with caution.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006).  Caution is further warranted because other decisions from this Court have treated the CMPA's exhaustion requirement as non-jurisdictional, including in a case, like this one, asserting a procedural due process claim under 42 U.S.C. § 1983, *see Hoey v. District of Columbia*, 540 F. Supp. 2d 218, 226–28 (D.D.C. 2008), and because the D.C. Circuit has yet to decide "whether federal courts . . . should treat a failure to exhaust remedies under the CMPA as a prudential concern," *Washington*, 170 F. Supp. 3d at 239–40.

Notwithstanding the lack of definitive guidance on the question, the Court is convinced that the CMPA does not deprive federal district courts of subject-matter jurisdiction to consider federal due process claims asserted by D.C. government employees.  To be sure, it is "well

concludes that the CMPA exhaustion requirement, even if applicable, is non-jurisdictional and that other grounds warrant dismissal of the claim against Gillis.

established that the CMPA's exhaustion requirement imposes a jurisdictional bar to filing suit in D.C. courts." *Amobi v. Brown*, 08-cv-1501, 2021 WL 3722710, at *7 (D.D.C. Aug. 23, 2021). But the jurisdiction of the federal courts is a wholly different matter. As Judge Ketanji Brown Jackson explained in a recent decision, "the CMPA is a law that was enacted by a local legislature, and it is a bedrock principle of federal-court jurisdiction that '[w]ithin constitutional bounds, *Congress* decides what cases the federal courts have jurisdiction to consider . . . and under what conditions[] federal courts can hear them.'" *Id.* at *7 (alterations in original) (quoting *Bowles v. Russell*, 552 U.S. 205, 212–13 (2007)). Here, the Court's subject-matter jurisdiction is premised on two federal statutes: 28 U.S.C. § 1331, which confers jurisdiction on federal district courts in civil cases "arising under the Constitution [or ] laws . . . of the United States," and 28 U.S.C. § 1343, which confers jurisdiction on federal district courts in civil cases brought "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution." Nothing contained in the CMPA purports to limit—or could limit—these grants of federal jurisdiction.

This does not mean that the CMPA has no bearing on due process claims asserted in federal court by D.C. employees; rather, it means only that the statute relates to the merits of the challenge and does not limit federal jurisdiction. Most notably, the fact that the CMPA provides an administrative remedy for certain adverse employment actions taken by D.C. government employers might well, in certain cases, provide all the process that is due under the Fifth Amendment. *See Hoey*, 540 F. Supp. 2d at 227. Here, however, the Court need not decide whether the CMPA gives rise to such a merits defense because, vested with jurisdiction, the Court may turn to other potentially dispositive defenses first. Given the (largely unbriefed) disagreement among the parties about whether Da'Vage was entitled to appeal to the OEA, that

course is the more straightforward path in this case.  *See id.* ("Where, as here, a plaintiff neglects to exhaust fully his available state administrative remedies, dismissal for 'failure to sufficiently plead a necessary element of a federal cause of action' is appropriate." (quoting *Washington v. District of Columbia*, 538 F. Supp. 2d 269, 275 (D.D.C. 2008)).

Of all the arguments that Gillis raises, the most clear-cut is that the complaint fails to allege that she was a state actor or that she acted under the color of state law, as is required under 42 U.S.C. § 1983 and the due process clause.  Dkt. 15-1 at 23–25.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Id.* at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  Public employees, accordingly, act "under color of state law" when they act in their "official capacity or while exercising [their] responsibilities pursuant to state law."  *Id.* at 50.  Similarly, to state a claim under the due process clause of the Fifth Amendment, a plaintiff must allege that the alleged deprivation was a product of state action, and thus the "absence of state action is fatal to [the plaintiff's] constitutional claim."  *Doe v. Rogers*, 139 F. Supp. 3d 120, 165 (D.D.C. 2015) (quoting *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 317 (4th Cir.2012)).

Here, however, Da'Vage does not allege that Gillis acted as an employee or officer of DCHA; rather, she allegedly acted as Da'Vage's union representative.  *See* Dkt. 1 at 16 (Compl. ¶ 49) ("Defendant Miranda Gillis, for the past decade and at all relevant times hereto was the president of the American Federation of Government Employee's Local #2725."); *see also* Dkt.

1-1 at 4 (Thaxton Aff. ¶ 4) ("Miranda Gillis, president of Local 2725 of the American Federation of Government Employees, is not an employee of DCHA and does not represent or have the authority to make decisions on behalf of DCHA.").  Nor does Da'Vage allege that Gillis violated a duty that was owed to him by the DCHA; rather, she allegedly violated her duty as a union representative by, for example, allowing him "to resign without advising [him] that resignation would preclude administrative appeal rights," Dkt. 1 at 18 (Compl. ¶ 57).  That is a problem for Da'Vage because "[l]abor unions . . . generally are not state actors."  *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).

Recognizing the need to allege that Gillis acted under color of state law and otherwise exercised the power of the state, Da'Vage alleges as follows:

> Mirand[a] Gillis['s] actions and inactions during the alleged misconduct investigation and Employee's Personnel Action[,] i.e., resignation[,] was entwined with the District of Columbia government wide policies, laws, rules and regulations or so impregnated with governmental characteristics that Mirand[a] Gillis['s] actions and inactions were subject to the constitutional limitations placed upon state action and inaction, thereby Mirand[a] Gillis acted under color of law during all relevant times conspiring with Agency to violate Plaintiff's constitutionally protected Due Process rights.

Dkt. 1 at 17 (Compl. ¶ 52).  But this is precisely the kind of "legal conclusion[] cast as factual allegation[]," *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018) (quotation marks omitted), that this Court may not credit in resolving a motion to dismiss. Da'Vage offers no factual allegations plausibly supporting the legal conclusion that Gillis conspired with the DCHA, and he offers no explanation of how her actions were "entwined with" D.C. governmental policy or were "impregnated with governmental characteristics."  Dkt. 1 at 17 (Compl. ¶ 52).  Because Da'Vage offers no supporting allegations to buttress his legal conclusions, his complaint fails adequately to allege that Gillis acted under color of state law or exercised state authority, and his § 1983 claim against Gillis fails as a matter of law.  *See*

*McManus v. District of Columbia*, 530 F. Supp. 2d 46, 71 (D.D.C. 2007) (holding that because "Plaintiffs' Amended Complaint d[id] not allege that the Labor Union Defendants are or were state actors in the context of Plaintiffs' terminations . . . the Labor Union Defendants could [not] be properly named as Defendants" under § 1983).

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that the DCHA defendants' motion to dismiss, Dkt. 12, is **DENIED**; Miranda Gillis's motion to dismiss, Dkt. 15, is **GRANTED**; and Da'Vage's motion for summary judgment, Dkt. 23, is **DENIED** as premature.  It is further **ORDERED** that Da'Vage's claim against Gillis is hereby **DISMISSED**.

      **SO ORDERED**.

                                        /s/ Randolph D. Moss
                                        RANDOLPH D. MOSS
                                        United States District Judge

Dated: January 28, 2022