**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GERALD D. DA'VAGE,

      *Plaintiff,*

   v.

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, *et al.*,

      *Defendant.*

Civil Action No. 21-1318 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiff Gerald Da'Vage, proceeding *pro se*, brings this wrongful termination action against the District of Columbia Housing Authority ("DCHA") and several DCHA officials.[1] Dkt. 1.  Plaintiff asserts a single claim under 42 U.S.C. § 1983, alleging that he was denied due process when he resigned from the DCHA under duress in the midst of a "gravely unfair investigation" into his conduct.  Dkt. 1 at 6 (Compl. ¶ 3).  Discovery closed on September 9, 2022, Min. Entry (Aug. 16, 2022), and the parties have filed cross-motions for summary judgment, *see* Dkt. 66; Dkt. 74, which, as of July 10, 2023, are now fully briefed.  Since the close of discovery, Plaintiff has filed five discovery-related motions that are currently before the Court, namely: (1) a "motion for dismissal with prejudice, default judgment and/or spoliation sanctions," Dkt. 59; (2) two motions to strike affidavits or exhibits, Dkt. 75; Dkt. 78; (3) a motion to strike one of DCHA's witnesses under Federal Rule of Civil Procedure 37(c)(1), Dkt.

---

[1] Plaintiff also sued the president of the union that represents DCHA employees, Miranda Gillis, Dkt. 1, but his claims against Gillis have since been dismissed for failure to state a claim.  Dkt. 29.

77; and (4) a motion for sanctions under Federal Rule of Civil Procedure 30(d)(2), Dkt. 76.  For

the reasons that follow, the Court will **DENY** each of Plaintiff's discovery motions.

## I. ANALYSIS

A.       **Motion for Dismissal, Default Judgment, or Spoliation Sanctions (Dkt. 59)**

Shortly after the close of discovery, Plaintiff filed a motion alleging that Defendants had

materially altered and destroyed documents "relating to [c]ritical [m]atters in [c]ontroversy" in

this case.  Dkt. 59 at 1.  At issue are three pages of handwritten notes taken by Defendant Ronnie

Thaxton.  *See* Dkt. 59-1 at 53–55.  The notes memorialize a meeting between Plaintiff, Thaxton,

and Plaintiff's union representative regarding an investigation into Plaintiff's misuse of a

DCHA-issued gas card.  *Id.*; *see* Dkt. 1 at 8–9 (Compl. ¶¶ 10–12).  Although the scanned copy of

the notes provided to Plaintiff in discovery is dated December 14, 2017, *see* Dkt. 59-1 at 53–55,

Plaintiff maintains that the meeting in question actually took place on December 19, 2017, and

that the document has been "altered and/or manipulated" to falsely "reflect" that the meeting

took place five days earlier.  *Id.* at 26.  Plaintiff further contends that this difference is material

because his claim that he resigned under duress rests on the premise that only two days separated

the notice of his investigation (which, on his telling, he received on December 19, 2017) and his

subsequent resignation (which all agree occurred on December 21, 2017).  *Id.* at 22–23, 33; Dkt.

1 at 7–8, 22 (Compl. ¶¶ 10–11, 71); Dkt. 66-1 at 13; Dkt. 73-1 at 16.

Suspicious that the document had been altered, Plaintiff requested that Defendants allow

him to view and copy the "wet ink" version of the notes.  Dkt. 59-1 at 32.  The DCHA made

efforts to comply with this request but, ultimately, it was unable to locate the original notebook

in which the notes appeared.  *Id.* at 32–33.  As Thaxton now explains in an affidavit offered

under the penalty of perjury, he kept the notebook in question "in a file cabinet in [his] office at

DCHA headquarters" and, at the request of DCHA counsel, he scanned and sent a copy of the relevant notes to counsel on February 7, 2022.  Dkt. 65-1 at 10 (Thaxton Aff. ¶¶ 34–35).

Thaxton is unsure what happened to the original notes after that—it is possible that they were destroyed under the DCHA's document retention policy or that they have been lost or misplaced. As Thaxton explains, after he provided a copy of the notes to counsel, the DCHA moved offices, and "DCHA management instructed all employees to purge and pack files to facilitate the move."  *Id.* (Thaxton Aff. ¶ 37).  Thaxton, then, reviewed and purged files consistent with the DCHA's three-year retention policy; he cannot recall, however, when he "became aware that the Office of General Counsel had issued a 'litigation hold' for the Da'Vage case."  *Id.* (Thaxton Aff. ¶ 39–40).

Nor can Thaxton recall "whether [he] placed the spiral notebook [containing the notes at issue] in one of [his] five boxes packed for transport to [his] new offices."  *Id.* (Thaxton Aff. ¶ 40).  In any event, only three of the five boxes found their way to Thaxton's new office.  *Id.* at 11 (Thaxton Aff. ¶ 41).  Thaxton reports that he has made efforts to locate the missing boxes but has been unsuccessful to date.  *Id.*

Based on his review of the scanned document, Plaintiff's forensic expert, Travis King, has opined that "there are 'indications' that the dates . . . may have been altered."  Dkt. 59-1 at 56.  But King explains that he needs the original notes in order to form "a more conclusive opinion" as to whether the date on the notes was in fact altered.  *Id.*  And there's the rub: Because Defendants are unable to locate the original notes, Plaintiff's expert cannot express a "more conclusive opinion" on whether the notes were doctored, and absent a "more conclusive opinion," it is not possible to know whether the version of the notes produced in discovery is

accurate or whether another version, with a different date, might have existed at the time the case was commenced.

Against this backdrop, Plaintiff moves for sanctions, arguing that, at least in his view, the date on the notes is inaccurate; that there is reason to believe that Defendants altered the notes to hurt his case; that Defendants had a duty to preserve the original version of the notes; and that, without the original version, he cannot conclusively prove that Defendants altered the date on the copy of the notes. *See* Dkt. 59. He asks the Court both to draw an "adverse inference [against Defendants] at summary judgment and trial," Dkt. 68 at 11, or, in the alternative, to enter default judgment against them, *id.* at 20. The DCHA counters that it "satisfied [its] duty" to preserve the relevant documents "by preserving a scanned, electronic copy of the Notes" and asserts that, even if it violated its duty to preserve the original "wet ink" copy, sanctions are unwarranted. Dkt. 65 at 11.

A district court has "inherent power to punish litigation misconduct . . . . with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as the[] [Court] find[s] necessary, including even dismissals and default judgments." *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995). This inherent power, in general, falls into two categories: the power to impose issue-related sanctions and the power to impose penal sanctions. With respect to the first category, "a district court may impose issue-related sanctions"— including "adverse evidentiary determination[s]" and "the related sanction of precluding the admission of evidence"—"whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Id.* at 1478. But with respect to the second category, a district court may exercise its inherent power to impose "sanctions that are fundamentally penal," *id.*—such as default judgments, contempt orders, and the award of

attorneys' fees or imposition of fines—only if it finds by "clear and convincing evidence" that

"the abusive behavior" occurred and finds that "a lesser sanction would not sufficiently punish

and deter the abusive conduct while allowing a full and fair trial on the merits." *Id.* at 1472.

Applying these distinct standards, the Court begins with Plaintiff's motion for an adverse

inference instruction at trial or, alternatively, an adverse inference at summary judgment and

then turns to his request for penal sanctions, including entry of a default judgment.

To establish that an adverse inference is warranted based on spoliation, the requesting

party must show that:

> (1) the party having control over the evidence had an obligation to preserve it
> when it was destroyed or altered; (2) the destruction or loss was accompanied
> by a "culpable state of mind;" and (3) the evidence that was destroyed or altered
> was "relevant" to the claims or defenses of the party that sought the discovery
> of the spoliated evidence, to the extent that a reasonable factfinder could
> conclude that the lost evidence would have supported the claims or defense of
> the party that sought it.

*Chen v. District of Columbia*, 839 F. Supp. 2d 7, 13 (D.D.C. 2011) (quoting *Mazloum v. D.C.

Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008)); *see also Mannina v. District of

Columbia*, 437 F. Supp. 3d 1, 6 (D.D.C. 2020).

On the present record, Plaintiff has failed to carry his burden of establishing that he is

entitled to an adverse inference. He does not argue that Defendants' initial production should

have included the original version of the notes or that Defendants' electronic production was

deficient. Rather, in Plaintiff's view, his need for the original version of the notes did not arise

until after his expert examined the copies in June 2022 and concluded that there were

"indications" that the dates "may have been altered." Dkt. 59-1 at 10, 56. According to Plaintiff,

it was not until sometime between June 27 and July 29, 2022, that he requested the opportunity

"to view, inspect, copy and photograph original wet ink documents used to make [the] copies

sent to Plaintiff." *Id.* at 10.  It was only at this point—long after Thaxton collected and sent

defense counsel a scanned copy of the notes in February 2022—that Plaintiff first suggested that

the original version of the notes might have independent evidentiary value.  And, as soon as

Plaintiff asked to inspect the original version of the notes, Thaxton searched for, but was unable

to find, the "spiral notebook" in which they were contained.  Dkt. 65-1 at 11 (Thaxton Aff. ¶ 41).

Unless and until the requesting party asks to inspect the original version of a document, it

is generally sufficient—and, indeed, the predominant practice in discovery—to produce a

photocopy of the original or a scanned, electronic copy of the document, which is "the modern-

day equivalent of exemplification and copies of paper." *Rundus v. City of Dallas*, 2009 WL

3614519, at *3 (N.D. Tex. Nov. 2, 2009) (internal quotation marks omitted).  Although litigants

and their counsel are well-advised to preserve original versions of all potentially relevant records

while a litigation is pending—and they run a risk if they fail to do so—it is far from clear that

Defendants had a legal obligation to preserve the original version of the notes at issue here after

they produced a correct copy of the notes in discovery.

The D.C. Circuit's decision in *Shepherd v. American Broadcasting Companies, Inc.*, 62

F.3d 1469 (D.C. Cir. 1995), is instructive on this point.  In the case, the district court sanctioned

ABC for, among other things, failing to preserve all copies of a memorandum that the plaintiffs

argued ABC had altered after they brought suit.  *Id.* at 1481.  The D.C. Circuit reversed, holding

that "[e]ven if the copies had existed when th[e] suit began, ABC's inability to produce them

during the sanctions hearing," for the purpose of determining whether the purported alteration

had occurred, did "not establish that ABC breached an obligation."  *Id.*  The court explained:

> Provided ABC conducted a diligent search for the memorandum in response to
> the interrogatories and produced the best evidence it found, we are unaware of
> any authority for the proposition that ABC had a duty to keep searching for
> additional copies *or the original*.  *Cf.* Fed. R. Evid. 1004 (copies are admissible

6

> evidence if original not lost or destroyed in bad faith) . . . . Obviously, if ABC discovered additional nonidentical copies, it was obligated to supplement its responses, *see* Fed. R. Civ. P. 26(e), as it did once it discovered [an additional copy that contained handwritten notes].

*Id.* (emphasis added).  To be sure, "if ABC [had] alter[ed] the memorandum, then its failure to preserve copies of the original memorandum would be sanctionable, but only as part of a scheme to cover up the alteration of the document." *Id.*  But "[i]n the absence of a proper finding that ABC altered the memorandum, . . . the fact that ABC could not find identical copies . . . [was] not independently sanctionable." *Id.*

The same is true here.  The DCHA complied with its discovery obligations when it produced "the best evidence it found," *id.*, which under Federal Rule of Evidence 1004(a) includes a copy of the notes, as long as the original version was "lost or destroyed, and not by the proponent acting in bad faith."  If the DCHA had in fact altered the notes, "then its failure to preserve copies of the original memorandum would be sanctionable, but only as part of a scheme to cover up the alteration of the document." *Shepherd*, 62 F.3d at 1481.  But Plaintiff has provided insufficient evidence to permit the Court to find—even by a preponderance of the evidence—that such a "scheme" existed.  Although Plaintiff's "[e]xpert [d]ocument [e]xaminer" avers that, in his "professional expert opinion," there are "'indications' that the dates on the . . . documents . . . *may have been* altered," Dkt. 59-1 at 56 (emphasis added), that assertion, even if credited, would not permit the Court to find that the document *was* altered—or even that it is likely or more probable than not that the document *was* altered.  In examining the copy of the notes, moreover, the Court is skeptical that any alteration occurred.  The document is dated on each page, and, although Plaintiff's expert correctly notes that "14" is *slightly* lower than the "12" and "17" on the first page, *id.* at 57, 60, the same is not true on the remaining pages, *id.* at 61–62, and the fact that one handwritten date is not perfectly even is of little probative value.

Other documents, as well as Thaxton's affidavit, which was offered under the penalty of perjury, moreover, confirm that the notes were prepared on December 14, 2017.  *See* Dkt. 65-1 at 8–9 (Thaxton Aff. ¶¶ 19–21, 26); *id.* at 21 (Ex. 4) (draft Notice of Disciplinary Action dated December 14, 2017); *id.* at 27 (Ex. 5) (screenshot indicating that the document titled "davagetermination12122017final" was last edited on December 14, 2017, at 4:57 p.m.).  Absent any persuasive evidence that Defendants engaged in "a scheme to cover up the alteration of the document," the Court concludes that by providing Plaintiff with a legible copy of the relevant notes the DCHA satisfied its duty to preserve.  *See Shepherd*, 62 F.3d at 1481.

In addition, Plaintiff has failed to establish that Defendants acted with a "culpable state of mind."  *Chen*, 839 F. Supp. 2d at 13.  To justify drawing an adverse inference, "the spoliation of evidence need not be 'purposeful;'" instead, "negligent spoliation may suffice."  *Id.*  Although the loss of the original notes during the DCHA's move might have been negligent had the DCHA not preserved correct copies of the original notebooks, the Court cannot conclude that the DCHA was negligent in failing to preserve the original "wet ink" notebooks where, after Plaintiff filed his complaint in this Court, Dkt. 1, Thaxton "collected, scanned, and sent by electronic mail [Plaintiff's] investigative file," including the notes at issue in this motion, Dkt. 65-1 at 10 (Thaxton Aff. ¶ 34).  *Cf. Chen*, 839 F. Supp. 2d at 14 (concluding that the defendants were "negligent in failing to preserve . . . security footage" because they "easily could have preserved it . . . by . . . burning a viable *copy* of the footage onto a DVD" (emphasis added)).  Before Plaintiff raised the concerns at issue in the instant motion, there was no reason to believe that the original version of the notes carried any independent evidentiary value, and, as far as the Court can discern, Plaintiff had yet to raise any concern or suspicion.

For all of these reasons, the Court finds that Plaintiff has failed to carry his burden of demonstrating that the Court should draw an adverse inference or impose any other issue-related sanction.  It follows, moreover, with even greater force, that Plaintiff has failed to establish that the Court should impose any penal sanctions.  Plaintiff has failed to show by a preponderance of the evidence that the DCHA engaged in any wrongdoing, and, having failed to satisfy this less demanding standard of proof, Plaintiff's evidence is necessarily far from sufficient to establish by "clear and convincing evidence" that the DCHA engaged in the type of misconduct that might warrant the imposition of penal sanctions.  To be sure, in an ideal world the DCHA would not have lost or destroyed the original version of the notes after producing a copy in discovery.  But the Court has no reason to believe that Defendants ignored their discovery obligations or engaged in any other misconduct, and there is no reason (beyond Plaintiff's speculation and a concededly inconclusive expert report) to believe that Thaxton (or some other DCHA employee) altered Thaxton's notes in the early days of the litigation (and then, presumably, destroyed the original notebook) in order to fraudulently claim that seven days, as opposed to two days, passed between Plaintiff's receipt of the notice of the investigation and his resignation.  Far more evidence than that offered here would be necessary to support such a serious claim of wrongdoing.

The Court will, accordingly, deny Plaintiff's motion for sanctions, Dkt. 59.

**B.**      **Motions to Strike Evidence (Dkt. 75, Dkt. 78)**

1.      *Affidavit of Paula Holmes-Stewart*

The Court turns, next, to Plaintiff's motion to strike a portion of an affidavit filed by Paula Holmes-Stewart, a Human Resources Specialist previously employed by the DCHA.  Dkt. 75; *see* Dkt. 66-30 at 2 (Holmes-Stewart Aff. ¶ 1).  Plaintiff moves to strike under Federal Rule

of Civil Procedure 12(f), which provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," and under Federal Rule of Civil Procedure 56(c)(4), which provides that "[a]n affidavit . . . used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Dkt. 75.  He asserts that three statements should be stricken from the affidavit because they were not "made on personal knowledge," as required by Rule 56(c)(4).  *Id.* at 2.  Those statements are:

- "I have first-hand knowledge that by a calendar invite, Mr. Gerald D. Da'Vage's exit interview was scheduled for December 21, 2017.  Mr. Da'Vage did not request a copy of either Exit Interview or Employee Clearance for Separation Form before the interview."

- "On December 21, 2017, Mr. Da'Vage arrived at my office and did not wish to proceed with the interview.  He stated that the sole purpose for his attendance was to return work equipment that was still in his possession."

- "Based on my review of the Employee Clearance for Separation Form, I recall asking Mr. Da'Vage what equipment he still had in his possession, to which he responded and submitted his work cellphone, phone charger and work tablet."

*Id.* (quoting Dkt. 66-30 at 2–3 (Holmes-Stewart Aff. ¶¶ 6, 7, 11)).

Plaintiff contends that, contrary to Holmes-Stewart's affidavit, she had no "first-hand basis or personal knowledge or experience with Mr. Da'Vage on Thursday, December 21, 2017." *Id.* at 3.  He continues:  Holmes-Stewart "does not and cannot submit an authentic screen shot of the [calendar] invite" discussed and she "fraudulently avers" that she asked Plaintiff what equipment he still had in his possession.  *Id.*  Plaintiff supports his motion with an "Employee Clearance for Separation Form" dated December 21, 2017, which is signed by Nikki Russell (and not by Holmes-Stewart), *id.* at 7, and an affidavit of his own, in which he attests that he "'did not' receive a calendar invite from Paula Holmes-Stewart;" that he "'did not' arrive at Paula Holmes-Stewart['s] office on Thursday, December 21, 2017;" and that he "'did not'

10

inform Paula Holmes-Stewart that the sole purpose for attending her office was to return DCHA

work equipment in his possession," *id.* at 8–9 (Da'Vage Aff. ¶¶ 7–9).  On Plaintiff's telling, he

"took [his] completed resignation letter to [the] DCHA HR department," where a receptionist

"accepted the resignation letter" and told him "to take [the] form to his division manager or

supervisor."  *Id.* at 8 (Da'Vage Aff. ¶¶ 1–6).  He attests that he then located Nikki Russell and

returned his DCHA property to her.  *Id.* at 8 (Da'Vage Aff. ¶ 6).

The "principal command of Rule 56(e) [now reflected in Rule 56(c)] is straightforward:

'Supporting and opposing affidavits' on summary-judgment motions 'shall be made on personal

knowledge, shall set forth such facts as would be admissible in evidence, and shall show

affirmatively that the affiant is competent to testify to the matters stated therein.'"  *Londrigan v.*

*FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (quoting then-current Fed. R. Civ. P. 56(e)).  The

"requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented;"

for that reason, "[a]n affidavit based merely on information and belief is unacceptable."  *Id.*

Applying that requirement, the D.C. Circuit has concluded, for example, that an affidavit

describing "assumptions made by [other] persons"—of which the affiant "cannot possibly have

personal knowledge"—must be stricken or disregarded under Rule 56(e).  *Id.* at 1175; *see also*

*Hall v. CIA*, 538 F. Supp. 2d 64, 67 (D.D.C. 2008) (concluding that a "conclusory statement

concerning an alleged historical event" was "not based on . . . personal knowledge").

The contested statements in Holmes-Stewart's affidavit, however, are not the kind over

which the affiant "cannot possibly have personal knowledge."  *Londrigan*, 670 F.2d at 1175.  To

the contrary, Holmes-Stewart avers that she has "first-hand knowledge" of the calendar invite

sent to Plaintiff; that Plaintiff "arrived at [*her*] office" on December 21, 2017; and that she

"ask[ed] Mr. Davage" about his equipment during that conversation.  Dkt. 66-30 at 2–3

(Holmes-Stewart Aff. ¶¶ 6, 7, 11).  Those descriptions of conversations and communications

between the affiant and Plaintiff are quintessentially descriptions based on "personal

knowledge."  That Plaintiff contests the veracity of these statements and attests in a competing

affidavit that he did not in fact speak to Holmes-Stewart on December 21, 2017, gives rise to a

dispute of fact, but it does not provide a basis to strike the affidavit.  Nor is it necessary, at this

stage of the proceeding, for the DCHA to bolster Holmes-Stewart's affidavit with extrinsic

evidence, like an "authentic screen shot of the [calendar] invite."  Dkt. 75 at 3.   Reserving any

dispute as to the truth of Holmes-Stewart's testimony for a later day, the Court concludes that the

affidavit satisfies Rule 56(c) and that Plaintiff's motion to strike, Dkt. 75, must be denied.

2.              *Affidavit of Ronnie Thaxton and Exhibit 21*

        Plaintiff next moves to strike Defendant's Exhibit 21—and a related clause in the

Thaxton affidavit—under Federal Rule of Civil Procedure 26(a)(3)(A)(iii).  Dkt. 78.[2]  That rule

provides that "a party must provide to the other parties and promptly file . . . an identification of

each document or other exhibit" that "it may present at trial."  Fed. R. Civ. P. 26(a)(3)(A)(iii).

Relatedly, Rule 26(a)(1)(A) provides that "a party must, without awaiting a discovery request,

provide to the other parties . . . a copy—or a description by category and location—of all

documents, electronically stored information, and tangible things that the disclosing party has in

its possession, custody, or control and may use to support its claims or defenses."  Fed. R. Civ. P.

26(a)(1)(A)(ii).  Plaintiff argues that Defendants failed to disclose to him a document entitled

"davage termination 1212017final"—the final version of Thaxton's Notice of Disciplinary

---

[2] Plaintiff subsequently moved to delay ruling on this motion until the Court had resolved
Plaintiff's motion for default judgment and sanctions, Dkt. 59.  *See* Dkt. 89.  Because the Court
has now resolved that motion, the Court will deny Plaintiff's request to delay ruling, Dkt. 89, as
moot.

Action against Plaintiff—and that the Court must, accordingly, strike from the record Thaxton's

reference to that document in his affidavit, and Exhibit 21, which is a screenshot showing when,

exactly, "davage termination1212017final" was last edited.  Dkt. 78 at 1; *see* Dkt. 65-1 at 8

(Thaxton Aff. ¶ 19); Dkt. 66-22 at 2 (Def.'s Ex. 21).

Defendants counter that they did, in fact, disclose "davage termination1212017final" to

Plaintiff on May 17, 2022, Dkt. 86-1 at 2, well before the close of discovery, and certainly well

before the deadline set by Rule 26(a)(3)(B), which presumptively requires that all pretrial

disclosures "be made at least 30 days before trial."  Defendants attach to their memorandum in

opposition a May 17, 2022 letter to Plaintiff, which listed documents produced in response to

Plaintiff's discovery requests, including "Draft Notices of Disciplinary Action w/ Exhibits, dated

12/7/17 and 12/14/2017," at Bates Numbers DCHA_000027–DCHA_000070.  Dkt. 86-2 at 2;

*see also* Dkt. 86-3 at 10–14 (copy of the Notice of Disciplinary Action with Bates Numbers

DCHA_00066–DCHA_00070).  Defendants also proffer the affidavit of Hubert Thom, the

Network Engineer of the Information Technology Department at the DCHA, verifying that the

document "davage termination1212017final," as seen in the screenshot in Exhibit 21, is in fact

that same document that was produced to Plaintiff in discovery.  *See* Dkt. 86-5 at 1, 3 (Thom

Aff. ¶ 13); *compare* Dkt. 86-5 at 13–17, *with* Dkt. 86-3 at 10–14.  For his part, Plaintiff offers no

response to Defendant's showing that the document was produced, nor does he maintain that that

he failed to receive the May 21, 2022 production.

The Court will, accordingly, deny Plaintiff's motion to strike, Dkt. 78.

C.      **Motion to Strike Witness (Dkt. 77)**

Plaintiff also moves to strike (or, presumably, to exclude) the testimony of Paula Homes-

Stewart pursuant to Federal Rule of Civil Procedure 37(c)(1).  Dkt. 77.  Rule 37 provides that

"[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial."  Fed. R. Civ. P. 37(c)(1).  Rule 26, in turn, requires that a party "provide to the other parties . . . the name and, if known, the address . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses," Fed. R. Civ. P. 26(a)(1)(A)(i), and that "[a] party . . . must supplement or correct its disclosure [under Rule 26(a)] . . . in a timely manner if the party learns that in some material respect [it] . . . is incomplete or incorrect," Fed. R. Civ. P. 26(e)(1)(A).  Plaintiff contends that Defendants cannot rely on testimony from Holmes-Stewart in support of their motion for summary judgment because they failed to list her in their initial disclosure (even though she was "likely to have discoverable information that may be used to support DCHA's claim") and because they did not "update their Initial Disclosure as required by the Rules."  Dkt. 77 at 1, 4. Defendants have, on Plaintiff's telling, "attempted to name a witness by ambush on the eve of summary judgment."  *Id.* at 4.

Defendants counter that they electronically served Plaintiff with copies of their first and second amended disclosures on June 14, 2022 and July 1, 2022, respectively, well before the close of discovery on September 9, 2022.  Dkt. 85 at 4.  Both of those disclosures, which Defendants attach to their opposition, list Holmes-Stewart and her contact information and indicate that "Ms. Holmes-Stewart can speak to what was discussed during Plaintiff's exit interview."  Dkt. 85-1 at 4 (Ex. 1) (June 14, 2022 Disclosure); Dkt. 85-1 at 12 (Ex. 2) (July 1, 2022 Disclosure).  Plaintiff does not dispute that he received these amended disclosures, nor does he maintain that the amended disclosures were untimely or otherwise improper.

The Court will, accordingly, deny Plaintiff's motion to strike, Dkt. 77.

14

**D.       Motion for Sanctions (Dkt. 76)**

Finally, the Court considers Plaintiff's second motion for sanctions, this one pursuant to

Federal Rule of Civil Procedure 30(d)(2).  Dkt. 76.   Rule 30(d)(2) provides that "[t]he court may

impose an appropriate sanction . . . on a person who impedes, delays, or frustrates the fair

examination of the deponent."  Plaintiff asserts that such a sanction is warranted here because

defense counsel made "forty-two (42) objections within the thirty-minute span of Plaintiff's

questioning" of deponent Miranda Gillis.  Dkt. 76 at 1.  He contends that defense counsel's

"excessive objections . . . disrupt[ed] the general flow" of the deposition and "unfairly

frustrat[ed]" his questioning.  *Id.* at 2.

The record before the Court does not support Plaintiff's contention that defense counsel's

objections were excessive or otherwise improper.  Defense counsel reasonably objected to

questions on the basis of "form," *see, e.g.*, Dkt. 66-25 at 6, 9, 11, 12, 13 (Def. Ex. 24) (Gillis

Dep.); on the ground that the questions assumed "facts . . . not in evidence," *id.* at 8; and on the

ground that Plaintiff failed to lay a proper foundation, *see, e.g.*, *id.* at 7, 9.  Notwithstanding his

many objections, counsel did not preclude Gillis from answering any questions; to the contrary,

counsel repeatedly advised her to answer Plaintiff's questions to the extent she was able to do so.

*See, e.g.*, *id.* at 8 ("Answer the question."); *id.* at 8–9 ("You can answer if you know what he's

talking about . . . ."); *id.* at 14 ("Objection to the form of the question, but you can answer the

question if you understand it."); *id.* at 16 ("Ms. Gillis, you may go ahead and answer the question

if you know the answer.").  Although counsel's objections may have slowed the deposition, they

did not "impede[], delay[], or frustrate[] the *fair* examination of the deponent."  Fed. R. Civ. P.

30(d)(2) (emphasis added).  To the contrary, a party is required to preserve objections during a

deposition, and reasonable objections are part and parcel of a "fair examination."  *Id.*  A

15

relatively large number of objections may, as here, simply mean that many of the questions

posed were objectionable.  That Defendant chose to conclude his questioning after thirty

minutes, moreover, does not suggest that defense counsel's objections were to blame for the

abbreviated nature of the deposition.  Rather, as Plaintiff himself put it:  "You know, that's it.  I

didn't have a lot.  That's it.  We can call it quits right there unless somebody else wants to ask

you any questions."  Dkt. 66-25 at 32–33 (Gillis Dep.).

The Court will, accordingly, deny Plaintiff's motion for sanctions under Rule 30(d)(2),

Dkt. 76.

## CONCLUSION

For the foregoing reasons, Plaintiff's discovery-related motions, Dkt. 59, Dkt. 75, Dkt.

76, Dkt. 77, Dkt. 78, Dkt. 89, are hereby **DENIED**.

**SO ORDERED**.


                                        /s/ Randolph D. Moss
                                        RANDOLPH D. MOSS
                                        United States District Judge


Date:  July 12, 2023