## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GERALD D. DA'VAGE, <br><br> *Plaintiff*, <br><br> v. <br><br> DISTRICT OF COLUMBIA HOUSING <br> AUTHORITY, *et al.*, <br><br> *Defendants.* | Civil Action No. 21-1318 (RDM) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Gerald Da'Vage, proceeding *pro se*, brings this wrongful termination action

against the District of Columbia Housing Authority ("DCHA") and several DCHA officials

(collectively the "DCHA Defendants" or "DCHA").[1]  Da'Vage asserts a single claim under 42

U.S.C. § 1983, alleging that he was denied procedural due process during a "gravely unfair"

investigation into his suspected misuse of a DCHA-issued credit card.  Dkt. 1 at 6 (Compl. ¶ 3).

Now before the Court are the parties' cross-motions for summary judgment.  Dkt. 66; Dkt. 74.

For the reasons stated below, the Court will grant Defendants' motion, Dkt. 66, and will deny

Da'Vage's motion, Dkt. 74.

### I. BACKGROUND

For purposes of resolving the cross-motions for summary judgment, the Court reviews

"the facts in the record and all reasonable inferences derived therefrom in a light most favorable"

---

[1] Da'Vage originally sued the president of the union that represents DCHA employees, Miranda Gillis, Dkt. 1 at 1 (Compl.), as well, but the Court granted Gillis's motion to dismiss for failure to state a claim, *Da'Vage v. D.C. Hous. Auth.*, 583 F. Supp. 3d 226, 240–42 (D.D.C. 2022).

to the nonmoving party. *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).[2]

## A.      Factual Background

Plaintiff Gerald Da'Vage worked as a DCHA housing inspector from December 2013 until December 2017. Dkt. 73-1 at 54 (Pl.'s Resp. to Def.'s SUMF ¶ 28). The terms of his employment were governed by the collective bargaining agreement ("CBA") between DCHA and Local 2725 of the American Federation of Government Employees. *Id.* at 49, 54 (Pl.'s Resp. to Def.'s SUMF ¶¶ 4–5, 26).

Da'Vage's job duties included conducting field inspections to "assure that all [Housing Choice Voucher Program] units [we]re safe, decent, sanitary[,] and in good repair." *Id.* at 54 (Pl.'s Resp. to Def.'s SUMF ¶ 29). To aid in that task, Da'Vage was provided access to a car and an American Express credit card to purchase gas. *Id.* at 54–55 (Pl.'s Resp. to Def.'s SUMF ¶¶ 30–32); Dkt. 66-8 at 3 (Dyer Aff. ¶ 16); Dkt. 66-12 at 2. In June 2017, Da'Vage received a

---

[2] In accordance with Local Civil Rule 7(h)(1), both the DCHA Defendants and Da'Vage filed a statement of material facts as to which they contend there is no genuine dispute, *see* Dkt. 66-1 (Def.'s SUMF); Dkt. 73-1 at 35–47 (Pl.'s SUMF), and have each responded to the other side's statement, *see* Dkt. 73-1 at 48–81 (Pl.'s Resp. to Def.'s SUMF); Dkt. 94-1 at 1–27 (Def.'s Resp. to Pl.'s SUMF).

Many of Da'Vage's responses purport to dispute facts that DCHA has set forth as undisputed. But rather than offering a "concise statement of genuine issues . . . to be litigated," LCvR 7(h)(1), Da'Vage's responses instead *supplement* Defendants' facts with argument about what a particular individual *should* have known or *should* have done at a particular time, without contesting with competent evidence what that person in fact did (or did not do) on a given date. *See, e.g.*, Dkt. 73-1 at 55–56 (Pl.'s Resp. to Def.'s SUMF ¶ 34). To the extent that Da'Vage labels certain facts as "disputed" but does not controvert the material facts in Defendants' statement by pointing to conflicting evidence, the Court considers those facts admitted for purposes of resolving the instant motion. *See* Fed. R. Civ. P. 56(e) (indicating that a court can "consider [a] fact undisputed for purposes of the motion" where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact"). Where factual assertions are genuinely disputed, however, the Court views the evidence in the light most favorable to the nonmoving party. *See Coleman*, 867 F.3d at 209.

new credit card after his previous card expired; at that time, he signed a "Fleet Issuance" form acknowledging that "[a]ny employee action, which results in abuse, misuse or inappropriate use of this credit card, will result in disciplinary action up to and including dismissal." Dkt. 73-1 at 55 (Pl.'s Resp. to Def.'s SUMF ¶¶ 31–32); *see also* Dkt. 66-14 at 2 (Davis Aff. ¶ 5) (explaining that DCHA-issued credit cards expire annually, and that, in order to receive a new card, employees are required to resubmit a Fleet Issuance form). Whenever Da'Vage used his DCHA credit card, he was required to submit receipts and to track his purchases in a "gas card log," detailing, among other things, the gas stations he had visited and how many gallons of gas he had purchased. Dkt. 73-1 at 55 (Pl.'s Resp. to Def.'s SUMF ¶ 33); Dkt. 66-8 at 3 (Dyer Aff. ¶ 11); Dkt. 66-13 at 2 (Gas Card Log).

The events relevant here occurred in November and December of 2017. On November 6, 2017, Shavon Davis, a DCHA operations specialist, reviewed the October charges for approximately 230 DCHA-issued credit cards. Dkt. 73-1 at 55 (Pl.'s Resp. to Def.'s SUMF ¶ 34); Dkt. 66-14 at 3 (Davis Aff. ¶ 10). During a random and routine audit, Davis found that Da'Vage's credit card reflected charges "totaling $532.87, whereas the average monthly expenditure for other employees at that time was $154." Dkt. 66-14 at 3 (Davis Aff. ¶ 12). Davis also noted that transactions had occurred in Maryland and that she did not have receipts for all of the transactions reflected on the billing statement. *Id.* (Davis Aff. ¶¶ 13–14). Davis called Milton Dyer, the inspections manager of the inspection division of DCHA's housing voucher program, to inform him of her findings. Dkt. 66-8 at 3 (Dyer Aff. ¶ 13).[3] After

---

[3] Davis attests only that she contacted Dyer, without specifying a date or method of contact. Dkt. 66-14 at 3 (Davis Aff. ¶ 16). Although Da'Vage disputes that Davis called Dyer on November 6, Dkt. 73-1 at 56 (Pl.'s Resp. to Def.'s SUMF ¶ 35) (citing Dkt. 73-2 at 222), the only competent evidence to which he points is evidence in the record that Davis contacted Dyer on November 8,

reviewing Da'Vage's gas card log, Dyer asked Nikki Russell, Da'Vage's immediate supervisor, to have Da'Vage return the active credit card and to submit any missing receipts for purchases made on the card.  *Id.* at 4 (Dyer Aff. ¶ 19).

At 1:21 p.m. that same day, November 6, 2017, Russell emailed Da'Vage requesting "the renewal gas card and all the receipts since it was issued to you by close of business."  Dkt. 66-15 at 2.  The next day, November 7, 2017, Russell and Dyer met with Da'Vage.  Dkt. 66-8 at 4 (Dyer Aff. ¶¶ 20–21); Dkt. 73-1 at 83 (Da'Vage Aff. ¶ 4).  Dyer "questioned . . . Da'Vage about the October purchases and why there had been purchases in Maryland" and informed him that "DCHA was going to review all purchases" dating back to July 2017.  Dkt. 66-8 at 4 (Dyer Aff. ¶ 21).  During the meeting, Da'Vage asserted that he purchased gas "no more than once a week, had not made purchases on weekends, had not made purchases in October totaling $532[,] and had not made purchases in Maryland."  *Id.* (Dyer Aff. ¶ 22).  But Da'Vage did not deny having improperly kept the card in his possession (as opposed to returning it to his supervisor's office at the end of each day) since it had been issued.  *Id.* (Dyer Aff. ¶ 23); *see also* Dkt. 66-16 at 3 ("Inspectors are required to return their gas cards and receipts at the Supervisor's office at the end of each business day.").  At that point, Da'Vage stopped responding to questions and requested a union representative.  Dkt. 66-8 at 4 (Dyer Aff. ¶ 24).  Dyer acknowledged that Da'Vage was entitled to union representation but stressed that Da'Vage needed "to provide sufficient gas receipts to justify the multiple purchases."  *Id.* (Dyer Aff. ¶ 25).

Dyer emailed Da'Vage the next day, November 8, 2017, stating:

I am following up with our meeting[] yesterday in regards to outstanding gas transactions without the gas receipts against your gas credit card . . . which you

---

2017; but a call on November 6 and an email on November 8 are not mutually exclusive, and Davis and Dyer's affidavits each discuss both points of contact, *see* Dkt. 66-14 at 3 (Davis Aff. ¶¶ 16–17); Dkt. 66-8 at 3, 5 (Dyer Aff. ¶¶ 13, 27).

had in your possession since June 2, 2017.  Please provide to us by the close of
business today any additional receipts to justify those gas transaction[s] that we
were unable [to] validate.

Dkt. 66-17 at 2.  Da'Vage responded: "All receipts have been turned in; to the very best of my

knowledge."  *Id.*; Dkt. 73-1 at 83 (Da'Vage Aff. ¶ 8).  That same day, Dyer requested from

operations specialist Davis an itemized list of Da'Vage's transactions for which DCHA was

missing corroborating receipts.  Dkt. 66-8 at 5 (Dyer Aff. ¶ 27).  Davis identified over twenty

transactions from July through November 2017 and provided Dyer with an itemized list of them

via email.  Dkt. 66-14 at 3 (Davis Aff. ¶ 17); Dkt. 66-18 at 2–3 (email dated November 8, 2017).

Several weeks later, on November 29, 2017, Dyer submitted to Ronnie Thaxton, a

manager in the DCHA human resources department, a memorandum recommending that

Da'Vage be terminated.  Dkt. 66-8 at 5 (Dyer Aff. ¶ 29); Dkt. 66-6 at 2, 4 (Thaxton Aff. ¶¶ 2,

15); Dkt. 66-16 at 2 (Dyer memo).  By December 7, 2017, Thaxton had "received the evidence

and prepared a draft Notice of Disciplinary Action for termination."  Dkt. 66-6 at 4 (Thaxton

Aff. ¶ 16); Dkt. 66-20 (draft notice).

A Notice of Disciplinary Action informs the recipient of the discipline being imposed, the

grounds for that discipline, and the supporting factual allegations.  Dkt. 66-27 at 2–4.  The notice

also advises the recipient of his "right to grieve th[e] action pursuant to Article 9[] of the

Collective Bargaining Agreement within twenty (20) work days of the effective date of th[e]

action."  *Id.* at 4.  During the grievance process, the recipient is able to contest the discipline and

certain procedural rights attach, including the right to "be represented by [a] union

representative, an attorney, or other representative" and the right to a "reasonable amount of

official time" to prepare "a grievance in defense of th[e] disciplinary action."  *Id.*

The parties dispute, to varying degrees, what happened after Thaxton prepared a draft Notice of Disciplinary Action.  All agree that a meeting between Da'Vage, union shop steward Lisa Kelly, and Thaxton took place in December 2017—Defendants contend on December 14, Da'Vage contends on December 19.  *See* Dkt. 73-1 at 62–66 (Pl.'s Resp. to Def.'s SUMF at ¶¶ 50–52); Dkt. 73-1 at 85–86 (Da'Vage Aff. ¶¶ 23, 38–39); Dkt. 66-6 at 4–5 (Thaxton Aff. ¶ 17–25); Dkt. 94-1 at 9–13 (Def.'s Resp. to Pl.'s SUMF ¶¶ 16–27).  Da'Vage claims that a *different* meeting occurred on December 14—one between him and Dyer, during which Dyer informed him that his unauthorized card usage was being referred to the DCHA human resources department.  Dkt. 73-1 at 36 (Pl.'s SUMF ¶¶ 6–8); Dkt. 73-1 at 84 (Da'Vage Aff. ¶¶ 9–15).  Da'Vage further claims that he met with Richard Allison, a union consultant, on December 15, 2017, to discuss the matter and that he told Allison that he wanted to introduce gas receipts he had found in the glove compartment of his vehicle as "mitigating evidence" showing "similar gas card purchase activity from [a] similar[ly] situated employee assigned to [the] vehicle before [the] vehicle was assigned to . . . Da'Vage."  Dkt. 73-1 at 37 (Pl.'s SUMF ¶¶ 11–12); *see* Dkt. 73-1 at 85 (Da'Vage Aff. ¶¶ 24–29).  Da'Vage does not explain whether or how those receipts would have shown that any other DCHA employee had made *unauthorized* use of his or her government-issued credit card.  According to Da'Vage, Allison advised him to wait until DCHA acted by issuing a Notice of Disciplinary Action and then to bring him any related information.  Dkt. 73-1 at 85 (Da'Vage Aff. ¶ 29); Dkt. 73-2 at 250 (Allison Aff. ¶¶ 13–15); Dkt. 94-1 at 8 (Def.'s Resp. to Pl.'s SUMF ¶ 13).

Aside from the issue of timing, Da'Vage does not materially dispute that union shop steward Kelly spoke with union president Gillis following the meeting between Da'Vage, Thaxton, and Kelly (whether that meeting occurred on December 14 or December 19).  Dkt. 73-1

at 68 (Pl.'s Resp. to Def.'s SUMF ¶ 59).  Nor does Da'Vage dispute that Kelly informed Gillis

that Da'Vage had admitted to using, and having sole possession of, the credit card at issue during

the relevant time period.  *See* Dkt. 73-1 at 68–69 (Pl.'s Resp. to Def.'s SUMF ¶ 60); Dkt. 73-2 at

160 (Gillis).

On December 19, 2017, Gillis met with Da'Vage (he contends by phone).  Dkt. 73-1 at

71 (Pl.'s Resp. to Def.'s SUMF ¶¶ 64).  During their conversation, Da'Vage admitted to having

used the DCHA-issued credit card but "did not think that he [had] used it that much," *id.* at 72

(Pl.'s Resp. to Def.'s SUMF ¶ 65), and expressed that "other employees also used the gas card,"

Dkt. 73-2 at 161 (Gillis).  On Da'Vage's telling, he "admitted to the lawful and authorized use of

the agency gas card."  Dkt. 73-1 at 72 (P.'s Resp. to Def.'s SUMF ¶ 65).  During their

conversation, Gillis (the union president) told Da'Vage that "the union [wa]s not [there] to

investigate other employees, and that [she] was only concerned with what he had done."  Dkt.

73-2 at 161 (Gillis).  Gillis then advised Da'Vage that:

> [W]hat he did was very serious and that, you know, it was theft.  And if the
> agency, depending on the amount, if the agency so chose to do so, they could
> move further with any other kind of prosecution, you know, depending on the
> amount.  I did not know what the amount was or how much he had used the
> credit card at that time.  But it was, you know—I thought it was important at that
> time that Mr. Da'Vage realize the seriousness of the action.

Dkt. 73-2 at 162–63 (Gillis).  Prior to speaking with Gillis, Da'Vage was unaware that he could

be criminally prosecuted for misuse of the DCHA-issued credit card.  Dkt. 73-1 at 73 (Pl.'s Resp.

to Def.'s SUMF ¶ 69).  Gillis also informed Da'Vage that the union was "going to be limited in

what it could do because . . . Da'Vage had already admitted to the use of the credit card, having

the credit card, . . . and no one else ever having it in his possession during the time he had . . .  it

for six months."  Dkt. 73-2 at 163–64 (Gillis).  Gillis told Da'Vage that if he had receipts, to

bring them in, and, "once the agency issued the discipline, [] the union would do whatever it

needed to do, file a grievance or whatever." *Id.* at 164.  According to Da'Vage, however, Gillis

never mentioned receipts.  Dkt. 73-1 at 74 (Pl.'s Resp. to Def.'s SUMF ¶ 72).  Finally, Gillis

advised Da'Vage that:

> [U]nless you're no longer employed by the agency or you resign or quit, when
> they finish what they're doing, they're going to serve the termination.  Only way
> you won't get it, is if you're not here to get it.  But, other than that, if they have
> the evidence, they're going to move forward.

Dkt. 73-2 at 164.

Even though Gillis was confident that termination was the most likely penalty, she

nevertheless attempted to negotiate a lesser penalty with Thaxton on Da'Vage's behalf.  Dkt. 73-

1 at 75 (Pl.'s Resp. to Def.'s SUMF ¶ 75); Dkt. 94-1 at 19 (Def.'s Resp. to Pl.'s SUMF ¶ 43); *see

also* Dkt. 73-2 at 161 (Gillis) (Q. "[B]ased on your experience with the [DCHA] Collective

Bargaining Agreement, you were aware that theft subjects an employee to termination?  A.

Absolutely").  Thaxton informed Gillis that the agency was "firm in its decision to terminate in

light of the fact that [Da'Vage] had just been written up six months prior for unauthorized use of

the vehicle."  Dkt. 73-2 at 114 (Gillis).  Thaxton did not, however, have unilateral termination

authority, and he told Gillis that he had submitted his recommendation for termination and was

awaiting signatures.  *Id.*  In any event, he informed Gillis that the "DCHA was going to be

moving forward with the termination and it was their intent to serve [Da'Vage] by that Friday,"

December 22.  *Id.* at 115 (Gillis).

On December 21, 2017, Thaxton called Gillis because Da'Vage had not reported for

work on December 20 or December 21, 2017.  Dkt. 73-1 at 76 (Pl.'s Resp. to Def.'s SUMF

¶ 78).  Gillis then called Da'Vage, who informed her that he would be resigning.  *Id.* at 77 (Pl.'s

Resp. to Def.'s SUMF ¶¶ 79–80).  According to Da'Vage, Gillis told him: "if you do not go to

the office today and turn in your resignation letter, HR will start to charge you your earned leave

and may even withdraw resignation offer and initiate a criminal investigation." *Id.* (Pl.'s Resp. to Def.'s SUMF ¶ 79). But Gillis's deposition testimony makes no mention of any such comments. *Compare id.*, *with* Dkt. 73-2 at 110–11 (Gillis). Regardless, all seem to agree that Gillis advised Da'Vage that, if he had receipts or other evidence of his non-culpability, he should not resign because the union would do whatever it could on his behalf. Dkt. 73-2 at 181–82 (Gillis). In response, Da'Vage reiterated his decision to resign. Dkt. 73-1 at 78 (Pl.'s Resp. to Def.'s SUMF ¶ 84).

Da'Vage asked for help in drafting a resignation letter, and Gillis arranged for him to meet with union consultant Allison for help. *Id.* (Pl.'s Resp. to Def.'s SUMF ¶ 85). Da'Vage "accepted the resignation letter" that Allison had prepared without making any changes and returned his equipment to DCHA that same day. *Id.* at 80–81 (Pl's Resp. to Def.'s SUMF ¶ 93–94). Da'Vage resigned on December 21, 2017. Dkt. 73-1 at 88 (Da'Vage Aff. ¶ 61).

## B.    Procedural History

Da'Vage filed this 42 U.S.C. § 1983 action on May 5, 2021. Dkt. 1 at 1 (Compl.). The suit seeks "full back pay and full benefits back pay with interest," as well as compensatory and punitive damages. *Id.* at 32 (Compl. ¶ 108). The crux of Da'Vage's complaint against DCHA and the other named DCHA defendants is that he was entitled to further process during the investigation into his alleged misconduct.

On August 6, 2021, DCHA and the named DHCA defendants jointly moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 12. Gillis filed a separate motion to dismiss on August 23, 2021. Dkt. 15. The Court denied the DCHA defendants' motion to dismiss but granted Gillis's. *Da'Vage v. D.C. Hous. Auth.*, 583 F. Supp. 3d 226, 242 (D.D.C. 2022). While the two motions to dismiss were still pending, Da'Vage filed a motion for

summary judgment, Dkt. 23, which the Court denied as premature. *Da'Vage*, 583 F. Supp. 3d at 233 n.5. The case then proceeded to discovery. On March 2, 2022, while discovery was ongoing, Da'Vage filed a second motion for summary judgment, Dkt. 33, which, after hearing from the parties, the Court again denied as premature. *See* Min. Entry (Mar. 24, 2022).

After the close of discovery on September 9, 2022, *see* Min. Entry (Aug. 16, 2022), the DCHA Defendants moved for summary judgment. Dkt. 66. Da'Vage filed a brief in opposition and cross-moved for summary judgment. Dkt. 73; Dkt. 74. On March 1, 2023, the Court entered an order advising Da'Vage of the requirements of Federal Rule of Civil Procedure 56 and giving him additional time to file a supplemental brief. *See* Dkt. 79 (*Fox/Neal* Order). Da'Vage did not file any supplement. The DCHA Defendants subsequently filed a reply brief in further support of their motion for summary judgment, Dkt. 93, as well as a separate opposition to Da'Vage's cross-motion for summary judgment, Dkt. 94. The parties' cross-motions for summary judgment are therefore fully briefed and ripe for the Court's consideration.[4]

## II.  LEGAL STANDARD

Summary judgment is warranted if a party can "show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006). The Court "must review each motion separately on its own

---

[4] After the close of discovery in this case, Da'Vage filed five discovery-related motions, all of which the Court denied. *See Da'Vage v. D.C. Hous. Auth.*, 2023 WL 4531768, at *1 (D.D.C. July 12, 2023). Da'Vage then filed a "Request for Interlocutory Appeal and/or Reconsideration," Dkt. 104, as to the Court's denial of one of those motions—his "Motion for Dismissal, Default Judgment, or Spoliation Sanctions," Dkt. 59. The Court denied Da'Vage leave to file an interlocutory appeal, *see* Dkt. 108 at 2, and the Court of Appeals for the D.C. Circuit subsequently dismissed the case for lack of prosecution, Dkt. 110-1 at 1.

merits 'to determine whether either of the parties deserves judgment as a matter of law.'"
*Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting
*Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "[N]either party waives the right to a
full trial on the merits by filing its own motion; each side concedes that no material facts are at
issue only for the purposes of its own motion."  *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d
369, 373 (D.D.C. 2013) (quoting *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir.
1989)).  "If the Court determines that one party is not entitled to summary judgment, it changes
tack on the cross motion and gives the unsuccessful movant all of the favorable factual
inferences that it has just given to the movant's opponent."  *Trudel v. SunTrust Bank*, 288 F.
Supp. 3d 239, 245 (D.D.C. 2018) (internal quotation marks and citation omitted).

The movant "bears the initial responsibility" of "identifying those portions" of the record
that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477
U.S. 317, 323 (1986).  A fact is "material" if it could affect the outcome of the litigation under
governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is
"genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving
party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the
light most favorable to the nonmoving party and must draw all reasonable inferences in that
party's favor.  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the movant carries this initial burden, the burden then shifts to the nonmoving party to
show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor
with respect to the "element[s] essential to that party's case, and on which that party will bear the
burden of proof at trial."  *Id.*  The nonmoving party's opposition, accordingly, must consist of
more than unsupported allegations or denials, and must be supported by affidavits, declarations,

or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment in favor of the nonmoving party.  *Liberty Lobby*, 477 U.S. at 249–50.

### III. ANALYSIS

**A.      DCHA's Motion for Summary Judgment**

In the sole count of the operative complaint, Da'Vage alleges a deprivation of his constitutional right to procedural due process.  Dkt. 1 at 19 (Compl. ¶ 58).  "In many cases, courts can decide whether an employee was afforded sufficient process based on the summary judgment record alone," *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 268 (D.D.C. 2022), either because the "amount of process" afforded to the employee was "reduced to zero" in a summary termination, *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991), or because it is clear, based on a weighing of the *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), factors, that the relevant termination proceedings were constitutionally sufficient.  The present case falls in the latter camp.

Before turning to the question of whether DCHA provided Da'Vage with constitutionally adequate process, there is a threshold question that the Court must confront:  Whether Da'Vage left DCHA voluntarily.  "[I]f an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred." *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trustees*, 610 F.3d 558, 564 (10th Cir. 2010).  That is so because, when an employee "resign[s]

of his own free will[,] . . . he relinquish[es] his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167,173 (4th Cir. 1988).  That rule, however, applies only when the employee resigns of his own free will.  In contrast, when an employee's resignation is made under duress or is otherwise involuntary, his resignation is "effectively a termination."  *Jefferson v. Harris*, 170 F. Supp. 3d 194, 207 (D.D.C. 2016) (quoting *Keyes v. District of Columbia*, 372 F.3d 434, 438 (D.C. Cir. 2004)).

Here, the Court need not decide whether Da'Vage's resignation was voluntary.  Even assuming that his resignation was in fact involuntary (or, more precisely, that a reasonable jury could so find), the undisputed evidence is such that no reasonable factfinder could find that Da'Vage was denied constitutionally adequate process before being "effectively [] terminat[ed]" on December 21, 2017.  *Jefferson*, 170 F. Supp. 3d at 207 (internal quotation marks and citation omitted).  Accordingly, DCHA is entitled to summary judgment.

To prevail on his procedural due process claim, Da'Vage must prove both that he was deprived of "life, liberty, or property" and that "the procedures used by the Government in effecting the deprivation [did not] 'comport with due process.'"  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  The DCHA Defendants do not dispute that Da'Vage has satisfied the first of these requirements.  *See* Dkt. 66 at 7 ("Beyond a peradventure of doubt, a public employee has a property interest in continued government employment that can be ended only if the employee is afforded procedural due process."); *see also* Dkt. 29 at 9.

The Court, accordingly, turns to the question whether "the procedures used by [DCHA]," in terminating Da'Vage comported with due process of law.  The Court, however, first takes a

moment to frame the procedural-due-process question before it.  Although Da'Vage and DCHA at times cite, and dispute, provisions of the operative CBA, *see, e.g.*, Dkt. 66 at 10–11; Dkt. 73-1 at 15, Da'Vage has not brought a claim for breach of that agreement.  *See DelCostello v. Int'l Broth. of Teamsters*, 462 U.S. 151, 163 (1983) ("It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement."); *see also Robinson v. WMATA*, 167 F. Supp. 3d 118, 126 (D.D.C. 2016) ("In general . . . because the resolution of such a suit requires interpretation of the CBA, claims alleging breach of a CBA are governed by § 301 of the Labor Management Relations Act . . . .").  Claims for breach of a CBA and for violation of the due process clause are distinct, and an asserted violation of a CBA does not itself "give rise to a cause of action under section 1983."  *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir. 1987).

Likewise, although Da'Vage complains that DCHA did not strictly comply with certain D.C. regulations, "courts have recognized that 'a breach of state procedural requirements is not, in and of itself, a violation of the Due Process Clause.'"  *Payne v. District of Columbia*, 808 F. Supp. 2d 164, 174 (D.D.C. 2011) (quoting *Atencio v. Bd. of Educ.*, 658 F.2d 774, 779 (10th Cir. 1981)); *Am. Fed'n of Gov't Emps., Local 2741 v. District of Columbia*, 689 F. Supp. 2d 30, 35–36 (D.D.C. 2009) ("A mere violation of law does not give rise to a due process claim." (quoting *AFGE, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 352 (D.C. Cir. 2007)).  Here, because Da'Vage has brought suit directly under 42 U.S.C. § 1983, Dkt. 1 at 4 (Compl.), the Court considers the question before it under the Fifth Amendment.  *See McManus v. District of Columbia*, 530 F. Supp. 2d 46, 70 (D.D.C. 2007) ("[T]he Fourteenth Amendment does not apply to the District of Columbia.").

"The essential requirements of due process," the Supreme Court has explained, "are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). These requirements are "flexible"—"procedural protections" wax and wane "as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Thus, a plaintiff may receive constitutionally sufficient due process even if, for example, he "desire[s] a greater opportunity to present [his] case than the limited nature of the [agency] hearing provided." *La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1115 (D.C. Cir. 1992). Identifying the specific dictates of due process requires the court to engage in the highly context-specific inquiry of weighing (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards'" and (3) "finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews*, 424 U.S. at 335. Despite the centrality of this balancing to the Court's analysis, neither party cites *Mathews* or endeavors to articulate the interests at stake. Nonetheless, based on the uncontroverted evidence before it, the Court concludes that no reasonable jury could find that Da'Vage was denied constitutionally sufficient notice of the charges against him and the opportunity to respond to them.

The first *Mathews* factor weighs in Da'Vage's favor. Assuming for present purposes that he did not voluntarily resign, he lost his job, and the "significance of the private interest in retaining employment" has long been established. *Loudermill*, 470 U.S. at 543.

In contrast, the second factor, the "risk of erroneous deprivation and the value of additional safeguards," *Propert*, 948 F.2d at 1332, weighs decidedly in DCHA's favor. To

begin, Da'Vage had ample notice of the charges against him and opportunity to be heard—the undisputed facts establish that Da'Vage met with DCHA personnel twice during the investigation, received emails and sent at least one email regarding the missing receipts, and consulted with both union consultant Allison and union president Gillis about the investigation and allegations against him.[5]   At both meetings with DCHA personnel, he was asked about his gas card usage and offered the opportunity to present his side of the story.  *See* Dkt. 73-1 at 62–66 (Pl.'s Resp. to Def.'s SUMF at ¶¶ 50–54); Dkt. 94-1 at 9–13 (Def.'s Resp. to Pl.'s SUMF ¶¶ 16–27); Dkt. 66-6 at 4 (Thaxton Aff. ¶ 17–25); Dkt. 66-8 at 4 (Dyer Aff. ¶¶ 20–21); Dkt. 73-1 at 83, 86 (Da'Vage Aff. ¶¶ 4, 23, 38–39).   He certainly understood that hundreds of dollars of purchases were made using a credit card that was in his sole possession and that, to rebut the charge of misuse of the credit card, he had to produce receipts showing that the undocumented purchases had in fact been made for official purposes.  He was the only one with access to those receipts, and he had ample opportunity to clear his name by showing that the purchases at issue were legitimate.  In a situation such as this, the Constitution requires no more.  *See Loudermill*, 470 U.S. at 545 ("[T]he pretermination 'hearing,' though necessary, need not be elaborate.").

As for his conversations with union representatives, Gillis specifically advised Da'Vage that the union was prepared to "do whatever it needed to do, file a grievance or whatever" on his behalf if he had evidence to present.  Dkt. 73-2 at 164 (Gillis).  The uncontroverted evidence also establishes that Da'Vage was aware from earlier discipline at DCHA that he had a right to present mitigating evidence, *see, e.g.*, Dkt. 66-4 at 37 (Da'Vage), but he offered neither Gillis

---

[5] Although the parties dispute the date of the meeting between Da'Vage, Thaxton, and Kelly, that dispute is not material.  Both December 14 and December 19 predate Da'Vage's resignation, and the five-day difference does not "affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248.

nor Allison any evidence or any indication of evidence that he had not, in fact, misused his DCHA-issued credit card. Indeed, the sole "mitigation" evidence he alluded to with Allison were receipts that he purportedly found showing similar theft on the part of *other* DCHA employees. Dkt. 73-1 at 37 (Pl.'s SUMF ¶¶ 11–12); Dkt. 73-1 at 85 (Da'Vage Aff. ¶¶ 24–29). That claim of mitigation, if anything, suggests that Da'Vage was guilty of theft, and there is no evidence that any sanction short of termination was foreseeable. As Gillis testified, she "[a]bsolutely" understood that "theft subjects an employee to termination." Dkt. 73-2 at 161 (Gillis). She also knew that Da'Vage would not receive leniency, because he had recently been disciplined for unauthorized use of a vehicle. She was, therefore, of the opinion that termination was the "only option" "[b]ased on the fact that Mr. Da'Vage had admitted to using a gas card when it was inappropriate to do so" and because "[t]here was no other option in the table of penalties." *Id*. at 171 (Gillis); *cf. English v. District of Columbia*, 815 F. Supp. 2d 254, 263 (D.D.C. 2011) ("[W]here an agency's decision turns on routine, standard, and unbiased information, or the implementation of an institutional policy, then a pre-deprivation hearing would not be effective in reducing the risk of erroneous deprivation."). Finally, the Court notes that, to this day, Da'Vage has yet to produce *any* evidence that, with some additional opportunity to be heard, he might have persuaded DCHA that Dyer, Thaxton, Russell, and Davis were all mistaken and that the purchases he had made using his DCHA-issued gas card were all for official business purposes.

The third *Mathews* factor requires the Court to consider the government's interest. Here, it is clear that DCHA had a compelling interest in promptly acting on the apparent misappropriation of government funds by one of its employees. *See Loudermill*, 470 U.S. at 543 (discussing the "governmental interest in the expeditious removal of unsatisfactory employees

and the avoidance of administrative burdens").  Not only did the agency have an interest in protecting government coffers, but it also had an interest in ensuring that those employed by the D.C. government discharge their responsibilities with honesty and integrity.  As a result, the third *Mathews* factor also weighs decisively in Defendants' favor.

In light of the uncontroverted evidence, the Court concludes that, on balance, the *Mathews* factors support only one tenable conclusion:  Da'Vage received constitutionally adequate process before he resigned.  He understood the charges against him and what he needed to do to rebut those charges, he had ample opportunity to produce receipts rebutting those charges yet failed to do so, and he received advice from union representatives with substantial experience and knowledge about the DCHA disciplinary process.  He accordingly received constitutionally adequate process, and, based, again, on the uncontroverted evidence, the Court concludes no reasonable jury could find to the contrary.[6]

In response, Da'Vage argues that the process he received was constitutionally inadequate because he: (1) did not receive from DCHA "written or oral notice appropriate to the nature of the case," Dkt. 101 at 2; *see* Dkt. 73-1 at 6; (2) was not advised of the procedures available to appeal the threatened termination, Dkt. 73-1 at 6, 17–18; (3) was not advised of his right to retain

---

[6] The undisputed record reflects that Da'Vage filed in 2018 an Office of Employees Appeal ("OAE") appeal but reveals little about the outcome of that proceeding.  *See* Dkt. 94-1 at 21–22 (Def.'s Resp. to Pl.'s SUMF ¶¶ 54–56).  Although unnecessary to support the Court's conclusion, the fact that Da'Vage availed himself of an appeal suggests that, even if some aspect of the pretermination procedures in this case were inadequate (although none was), the administrative appeal at least arguably offered an opportunity to address any such deficiency. *See Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 124 (D.D.C. 2012) (concluding that even if the plaintiffs' pretermination hearings were "sham[s]," the fact that their grievance was later heard by an arbitrator cured any due process issue); *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261–62 (1987) ("[T]he Court has upheld procedures affording less than a full evidentiary hearing if 'some kind of a hearing' ensuring an effective 'initial check against mistaken decisions' is provided before the deprivation occurs, and a prompt opportunity for complete administrative and judicial review is available.").

private counsel, *id.* at 9; (4) was not presented with "physical evidence" or "anything in writing explaining DCHA's evidence" during the investigation into his misconduct, leaving him "vulnerable to assuming what actions led to" the allegations against him, *id.* at 9–10; and (5) was not privy to "ex parte" communications between Thaxton and Russell regarding his alleged conduct, *id.* at 10–11.

Many of Da'Vage's arguments are belied by undisputed facts before the Court. Beginning with the lack of "written or oral notice," Russell, Da'Vage's immediate supervisor, emailed Da'Vage on November 6, 2017 asking Da'Vage to return his credit card to DCHA custody and to submit any missing receipts by close of business that day.  Dkt. 66-15 at 2 ("Please provide the renewal gas card and all receipts since it was issued to you by close of business today.").  The very next day, Da'Vage met with Russell and Dyer, who questioned him about his gas log and gas card use and purchases.  Dkt. 66-8 at 4 (Dyer Aff. ¶¶ 20–21); Dkt. 73-1 at 83 (Da'Vage Aff. ¶ 4).  Da'Vage was informed that all of his purchases from July 2017 onward were going to be reviewed.  Dkt. 66-8 at 4 (Dyer Aff. ¶ 21).  Da'Vage does not dispute that this meeting took place or that his gas logs were discussed.  Dkt. 94-1 at 3 (Def.'s Resp. to Pl.'s SUMF ¶ 4) ("On November 7, 2017, Plaintiff met with Ms. Russell and Milton Dyer for a first of the month meeting to discuss incomplete gas logs.").  Although he suggests that the meeting was a routine one and that no questioning occurred, Dkt. 73-1 at 57–59 (Pl.'s Resp. to Def.'s SUMF ¶¶ 37–43), his characterization of the meeting does not undercut the undisputed evidence that he was confronted with the potential misuse of the credit card and offered the opportunity to respond, *id.* at 60 (Pl.'s Resp. to Def.'s SUMF ¶¶ 44–45).

What cannot be disputed (or even characterized in different ways) is that the very next day Dyer wrote to Da'Vage requesting, again by close of business, "any additional receipts to

justify those gas transaction[s] that *we were unable [to] validate*" made "against your gas credit card . . . which you have had in your possession since June 2, 2017." Dkt. 66-17 at 2 (emphasis added).  Da'Vage responded that "[a]ll receipts have been turned in; to the best of my knowledge."  *Id.*  Agency records revealed that DCHA was missing receipts for over twenty purchases made on Da'Vage's gas card.  Dkt. 66-14 at 3 (Davis Aff. ¶¶ 17–18).  For present purposes, what matters is that, as of November 8, 2017, Da'Vage had notice that DCHA was investigating purchases made on his gas card for which receipts were missing, that he had the opportunity to respond, and that he claimed to have already produced all the records he had.

Turning to Da'Vage's claims that DCHA failed to present him with "physical evidence" and that he never received "anything in writing explaining DCHA's evidence," neither was required to satisfy due process in the context of this case, where DCHA's "evidence" consisted of missing documentation from Da'Vage himself.  To be sure, "[b]oth the Supreme Court and th[e] [D.C. Circuit] have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process."  *Ralls Corp.*, 758 F.3d at 318.  But having had multiple opportunities to "present his side of the story," *Goss v. Lopez*, 419 U.S. 565, 581 (1975), and instead informing DCHA that he had provided all of the missing receipts, Da'Vage cannot now claim that he was denied the opportunity to rebut the evidence against him.  This case is worlds away from core due process concerns arising when, for example, a decisionmaker relies on charges or evidence that were never made known to the plaintiff, *see*, *e.g.*, *Ralls Corp.*, 758 F.3d at 319, or where the plaintiff never had a meaningful opportunity to respond to those charges or evidence.  Indeed, Da'Vage's discussion of potentially "mitigating" evidence with Allison, after being informed that his

unauthorized card usage was being referred to human resources, puts the lie to any suggestion
that he was unaware of the nature of the allegations against him.

Da'Vage's remaining arguments—that he was not advised of the procedures available to
appeal the threatened termination, that he was not advised of his right to retain counsel during
DCHA's investigation, and that Thaxton and Russell engaged in "ex parte" communications—
fare no better.  On the first point, Da'Vage had worked for the district for over a decade, Dkt. 73-
1 at 35 (Pl.'s SUMF ¶ 1), and was aware that a grievance procedure could be initiated once a
member of the collective bargaining unit was served with a written notice of discipline, *id.* at 51
(Pl.'s Resp. to Def.'s SUMF ¶ 11 (citing Dkt. 66-3 at 123–24 (Da'Vage)).  *See also* Dkt. 66-3 at
124–25 (Da'Vage testifying that he has "been in unions" "all [his] life" and was aware that "you
can grieve" discipline).  Among other things, he had personal experience receiving and grieving
discipline in the past.  On November 3, 2017, Da'Vage received a Notice of Disciplinary Action
for conduct unrelated to this case and was suspended for three days without pay.  Dkt. 66-27 at
3–4.  And, in 2014, he successfully grieved a Notice of Disciplinary Action for termination.  He
was undoubtedly familiar with the grievance process long before the conduct at issue here took
place.  Dkt. 66 at 16; Dkt. 66-28 at 2–3 (Allison Aff. ¶¶ 6–7); Dkt. 73-1 at 79 (Pl.'s Resp. to
Def.'s SUMF ¶ 88).  As for the right to counsel, Da'Vage fails to cite any authority, and the
Court is aware of none, suggesting that a government employer must, as a matter of due process,
advise its employees of their right to retain private counsel before taking disciplinary action.
Here, moreover, Da'Vage received advice from experienced union representatives.  Finally,
nothing in the due process clause precludes government officials from having private
conversations about how to handle disciplinary matters.

The Court, accordingly, concludes that the DCHA Defendants are entitled to summary judgment on the ground that Da'Vage received all the process to which he was *constitutionally* entitled.  Because the Court will enter judgment in Defendants' favor on this ground, it need not reach Campbell, McCoy, and Thaxton's alternative argument that they are shielded by qualified immunity.  The Court notes, however, that their right to qualified immunity follows, *a fortiori*, from the Court's conclusion that no constitutional violation occurred.  *See Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015).

**B.     Da'Vage's Cross-Motion for Summary Judgment**

In evaluating Da'Vage's cross-motion, the standard is flipped and DCHA's evidence "is to be believed, and all justifiable inferences to be drawn in [its] favor."  *Liberty Lobby*, 477 U.S. at 255.  Da'Vage's cross-motion wholly overlaps with his opposition to DCHA's motion for summary judgment.  Dkt. 73; Dkt. 74.  For the same reasons that the DCHA Defendants are entitled to summary judgment, Da'Vage's cross-motion fails.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment, Dkt. 66, will be granted and Da'Vage's cross-motion for the same, Dkt. 74, will be denied.

A separate order will follow.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 31, 2024